**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VIRGINIA FOLEY; ESTATE OF LAURENCE MICHAEL FOLEY, SR., by and through its Administrator Virginia Foley; MEGAN FOLEY; JEREMIE FOLEY ROBENOLT; LAURENCE MICHAEL FOLEY, JR.; CAROLYN J. MAUPIN; ESTATE OF KEITH MATTHEW MAUPIN, by and through its Administrator Carolyn J. Maupin; KEITH MAUPIN; CHRISTINA MENCHACA; ESTATE OF KRISTIAN MENCHACA, by and through its co-Administrators Christina Menchaca and Julio Cesar Vasquez Menchaca; PEDRO MENCHACA; MARIA GUADALUPE VASQUEZ; JULIO CESAR VASQUEZ MENCHACA; NADIRA THUNEIBAT; ESTATE OF LINA MANSOOR THUNEIBAT, by and through Frank Schulterbrant, Esq. as Special Administrator; ESTATE OF MANSOOR AL-THUNEIBAT, by and through Frank Schulterbrant, Esq. as Special Administrator; OMAR MANSOOR THUNEIBAT; MUHAMMAD MANSOOR THUNEIBAT; TARIQ AHMAD KHORMA; ESTATE OF MOUSAB AHMAD KHORMA, by and through its Administrator Tariq Ahmad Khorma; ESTATE OF SAMIRA FAYEZ KHORMA, by and through Tariq A. Khorma, Zeid A Khorma and Tatsiana A. Khorma; TATSIANA AHMAD KHORMA; ZEID AHMAD KHORMA; FRIMET ROTH; ESTATE OF MALKA CHANA ROTH, by and through its legal representatives Arnold Roth and Frimet Roth; PESIA ROTH; RIVKA ROTH RAPPAPORT; ZVI NEHEMIA ROTH; SHAYA ELAZAR ROTH; and PINCHAS MOSHE ROTH, <br><br> Plaintiffs, <br><br> v. <br><br> UNION DE BANQUES ARABES ET FRANÇAISES, <br><br> Defendant. | Civil Action No. _____ <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMAND** |

## INTRODUCTION

1.      From at least August 2011 to April 2013, the Union de Banques Arabes et Françaises ("UBAF") worked with the Syrian Arab Republic ("Syria") to evade U.S. sanctions by accepting funds from Syria and its instrumentalities and conducting on Syria's behalf at least 127 fraudulent transactions, with a collective U.S. Dollar value of more than $2 billion, in and through the U.S. financial system.  This occurred while Plaintiffs—the victims and their family members of acts of terrorism sponsored by Syria—had cases pending against Syria, which resulted in judgments totaling approximately $531,665,554.  To date, Syria has not paid those judgments.  By conducting billions of dollars in fraudulent conveyed assets through New York, UBAF's actions deprived Syria's judgment creditors, including Plaintiffs, of hundreds of millions of dollars in recovery.

2.      Syria made the transfers through the U.S. financial system with full knowledge of Plaintiffs' lawsuits, and with the intent of circumventing those cases and their eventual judgments, as well as U.S. laws specifically designed to capture Syrian funds.  Had the true parties to these transfers been disclosed, these transfers could have been subject to attachment and seizure by Plaintiffs and other victims of Syrian-sponsored terrorism, consistent with U.S. sanctions and the Terrorism Risk Insurance Act ("TRIA").  Syria and its instrumentalities made the transfers to UBAF for the purpose of avoiding Plaintiffs' claims and U.S. sanctions.  Because of UBAF's admitted reckless disregard for its U.S. sanctions compliance obligations, Syria was able to evade attachment and seizure by Plaintiffs, even as UBAF management had full knowledge of, and benefited from, the relevant transfers.

3.     Syria has been continuously designated as a state sponsor of terrorism by the U.S. Department of State since 1979.[1]  For many years, Syria provided safe haven to Hamas, the militant Islamic group that carried out, among other attacks, the "Jerusalem Bombing," a bombing at a Sbarro restaurant in Jerusalem in 2001.[2]  Syria also provided material support to al-Qaeda in Iraq ("AQI"), also known as the Zarqawi Terrorist Organization, which was responsible for the November 2005 "Amman Bombings," the abduction and torture of Staff Sergeant Keith Mathew Maupin and Private First Class Kristian Menchaca, and the assassination of United States Agency for International Development ("USAID") agent Laurence Foley.[3]

4.     As a result of Syria's sponsorship of Hamas's and AQI's terrorism generally, and of these attacks in particular, the D.C. District Court held Syria liable for a total of approximately $531,665,554.

5.     Plaintiffs are the victims and family members of victims of these attacks. Accordingly, they are entitled to collect on the $531,665,554 judgments against Syria, which were imposed to account for the unfathomable pain and suffering Syria caused Plaintiffs through its material support of deadly terrorist attacks.  Nevertheless, despite dogged pursuit by its judgment creditors, the judgments remain unsatisfied.

6.     If detected in the U.S. financial system, Syria's assets could have been used to satisfy Plaintiffs' claims.  Having litigated against U.S. judgment creditors—who have sought for years to enforce their judgments arising out of Syria's support of terrorism resulting in their

---

[1]  *Roth v. Syrian Arab Republic*, No. 14-cv-1946, 2018 WL 4680270, at *3 (D.D.C. Sept. 28, 2018).

[2]  *Id.*

[3]  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016).

injuries—Syria was well-aware of the danger that its funds would be seized by judgment creditors such as Plaintiffs unless elaborate subterfuge was successfully employed.

7.      Syria was sued under U.S. law for its support of terrorism many times from 2000 through 2011 (and beyond).  Indeed, Syria's Foreign Ministry in Damascus received copies of translated lawsuits so many times that it instructed its personnel to affirmatively reject the delivery of any further lawsuits, requiring different forms of service under the Foreign Sovereign Immunities Act ("FSIA").

8.      Faced with these suits, Syria had hired U.S. lawyers to defend it in court on several occasions prior to 2010, and had its assets frozen in the U.S. on August 17, 2011, by Executive Order 13582, some of which were then the subject of U.S. proceedings by victims of terrorism, which resulted in their seizure in 2011.  Accordingly, Syria's government was clearly on notice of the perils posed to Syrian assets by TRIA judgment holders.

9.      To evade detection and its debts to terror victims like Plaintiffs, Syria worked to develop a fraudulent conveyance scheme involving transactions that masked the flow of funds that Syria caused to be transferred into UBAF, which transferred the funds into the U.S. financial markets and the New York banking system.  Through these fraudulent transactions, Syria transferred or caused to be transferred over $2 billion worth of its funds to and through bank accounts at UBAF to other accounts within UBAF, and eventually through UBAF's correspondent accounts in New York, without risk of execution by Plaintiffs.  These transfers were made possible through an agreement between Syria, its agents and instrumentalities, and senior officials at UBAF that UBAF would allow the transfers to go forward, and that UBAF would knowingly execute subsequent transfers through its U.S. correspondent accounts in New York for the benefit of Syria in evading U.S. sanctions.

10. This carefully calculated deception not only allowed Syria to evade its debts to Plaintiffs, it also allowed Syria to circumvent the U.S.-Syrian sanctions regime, which was designed and implemented specifically to exclude Syria from the U.S. financial system and capital markets. Indeed, in order to successfully execute this fraud, UBAF flouted U.S. banking regulations and withheld information from U.S. regulators on behalf of Syria for years.

11. Each transfer by Syria into UBAF and then onwards through the New York banking system was a fraudulent conveyance designed to allow Syria to evade attachment and seizure by Plaintiffs. These transactions resulted in asset and capital transfers that were not exchanged for equivalent value. In addition, each transaction was effectuated without fair consideration, as they were not made on a good faith basis since each transaction was specifically intended to evade or circumvent both UBAF's and Syria's obligations under U.S. law.

12. Syria's fraudulent conveyances cannot stand under New York law. Syria was a defendant in multiple lawsuits that ultimately resulted in judgments totaling more than $500 million in favor of Plaintiffs when Syria and UBAF schemed to funnel Syrian assets through UBAF and into the United States without detection by Plaintiffs. The fraudulent transfers and conveyances must be undone, and the assets must be turned over to Plaintiffs to compensate these long-suffering victims of terrorism in compliance with New York law.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs seek relief under federal law, namely the TRIA. Plaintiffs' lawsuit necessarily raises issues of federal law, including Plaintiffs' entitlement to relief under the TRIA.

14. This Court has personal jurisdiction over UBAF pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which permits this Court to exercise personal jurisdiction to the extent

allowed by New York statutes.  New York's CPLR 302 provides jurisdiction over UBAF based on UBAF's purposeful availment of the privilege of doing business in New York.  Specifically, UBAF transacted business in New York by maintaining correspondent accounts at financial institutions located in New York for the purpose of regular and ongoing business in New York (and this District).  Syria and its instrumentalities caused the transfer of funds through UBAF's New York correspondent accounts as part of its fraudulent scheme.  Further, UBAF knowingly initiated such transactions to be completed in U.S. Dollars routed through New York-based correspondent accounts to complete the fraudulent scheme, as directed by Syria.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York.

### THE PARTIES

16.    Plaintiffs are the victims and their family members of bombings, kidnappings, executions, and an assassination, all carried out with the critical material support of the Syrian government.  These individuals have suffered severe physical and psychological injuries, including loss of life, loss of limbs, permanent disabilities, physiological trauma, and devastating and debilitating emotional distress.  Plaintiffs are United States citizens and/or residents—or the estate, administrator or similar representative of such citizens and residents—and their family members.  Each Plaintiff obtained—or represents an estate that obtained—a final judgment under U.S. law against Syria.

17.    Defendant UBAF is a foreign financial institution organized under the laws of France, and headquartered in, Paris. France.  UBAF was established in 1970.  It maintains branch offices in Tokyo, Seoul, and Singapore, as well as representative offices in Cairo, Dubai, Algiers,

and Dhaka.[4]  UBAF utilizes correspondent bank accounts all over the world, including in New York.  UBAF reported €1,853,776,000 in assets at the end of 2019.[5]

18.     On January 4, 2021, UBAF entered into an $8,572,500 settlement with the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC") in connection with UBAF's facilitation of the transfer of over $2 billion through UBAF accounts in violation of U.S. sanctions against Syria.[6]

## FACTUAL ALLEGATIONS

### I.     Syria Owes Over $500 Million To Plaintiffs

#### A.     Abductions, Assassination, Torture and Executions

19.     On October 28, 2002, Laurence Foley, a USAID agent assigned to Amman, Jordan, whose wife and estate are plaintiffs in this action, was shot seven times outside his residence.[7]  AQI was responsible for his assassination.[8]

20.     On April 9, 2004, Staff Sergeant Keith Mathew Maupin, whose next-of-kin are plaintiffs in this action, was in a convoy that was ambushed west of Baghdad, Iraq.[9]  Maupin was abducted, tortured, and ultimately executed.[10]  AQI was responsible for his murder.[11]

---

[4]  UBAF Presentation, UBAF, https://www.ubaf.fr/en/ubaf-presentation (last visited Jan. 22, 2021).

[5]  UBAF, *2019 Annual Report*, UBAF (2019), *available at* https://www.ubaf.fr/en/ubaf-presentation.

[6]  T.D. Enf't Release (Jan. 4, 2021), *available at* https://home.treasury.gov/system/files/126/01042021_UBAF.pdf.

[7]  *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 195 (D.D.C. 2017).

[8]  *Id.* at 196.

[9]  *Id.* at 196–97.

[10]  *Id.*

[11]  *Id.* at 197.

*(Cont'd on next page)*

21.     On June 16, 2006, Private First Class Kristian Menchaca, whose next-of-kin are plaintiffs in this action, was abducted while manning an observation post in Iraq.[12]  An expert called what was done to Menchaca before he was killed "beyond torture," and it was "placed for the whole world to see to terrorize an entire nation, bring incredible pain and suffering to his family, and go well beyond just total disregard for PFC Menchaca."[13]  AQI was responsible for his murder.[14]

### B.     D.C. District Court Action Arising from the Foley Assassination, Maupin Execution, and Menchaca Execution

22.     On April 8, 2011, Foley, Maupin, and Menchaca's estates and family members filed a lawsuit against Syria, the Syrian Military Intelligence, President Bashar al-Assad, and General Asif Shawkat, pursuant to 28 U.S.C. § 1605A of the FSIA.[15]  The *Foley* plaintiffs successfully served the defendants on January 22, 2015.[16]  The defendants failed to respond to the amended complaint and, on January 22, 2016, the clerk of the D.C. District Court entered default against them.[17]  The D.C. District Court held a liability hearing on November 16 and 17, 2016, and granted default judgment as to defendants' liability on April 13, 2017.[18]

---

[12]  *Id.* at 198.

[13]  *Id.*

[14]  *Id.* at 199.

[15]  *See generally Foley v. Syrian Arab Republic*, Case No. 11-cv-699 (D.D.C.) ("*Foley*").

[16]  *Id.*, Dkt. 51.

[17]  *Id.*, Dkt. 52.

[18]  *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d at 190, 206.

*(Cont'd on next page)*

23.     The court found Syria had "provided material support to [AQI's] terrorist activity," "by, among other things, providing them safe haven, weaponry, financial support, and even allowing them to open headquarters within Syria."[19]

24.     Among other things, Syria had "allowed key [AQI] officials to reside and operate within Syria during this period with apparent impunity," and terrorist groups "to freely move through Syria and into neighboring countries, such as Iraq and Jordan, for the express purpose of killing Americans."[20]  Indeed, there was a "'special interest section' in downtown Damascus, directly across the street from the United States Embassy, where individuals could sign up and board a bus to Baghdad to 'wage the jihad' against Americans."[21]  Moreover, "Syrian border checkpoints would allow foreign insurgents to pass through freely, stamping their passports with phrases such as 'volunteer for jihad.'"[22]

25.     The court found "[t]he Syrian government also had a number of direct ties to the Zarqawi Terrorist Organization," and "Syria's support for the Zarqawi Terrorist Organization was a matter of Syrian policy known and dictated from the highest levels, including Defendants Assad and Shawkat."[23]

26.     The court referred the case to a special master to administer damages proceedings.[24] After reviewing the special master's report, the court awarded the *Foley* plaintiffs $109,279,469

---

[19]  *Id.* at 192, 195.

[20]  *Id.* at 192–94.

[21]  *Id.* at 192.

[22]  *Id.*

[23]  *Id.* at 194.

[24]  *Id.* at 206.

*(Cont'd on next page)*

in damages against the defendants.[25]  Syria was served with notice of the judgment in accordance with the FSIA on June 20, 2018.[26]

27.    Syria is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it.  The judgment presently remains unsatisfied.

28.    Plaintiffs in this action include all the plaintiffs named in *Foley* except for Julietta and Kenneth MacKenzie, and Isaac Murillo, whom the court did not award damages.

### C.    *The Amman Bombings*

29.    On November 4, 2005, AQI sent four suicide bombers to the lobbies of the Radisson SAS, the Grand Hyatt, and the Days Inn, in Amman, Jordan.[27]  The attacks killed fifty-seven civilians.  Among those killed were nine-year-old Lina Mansoor Thuneibat, whose estate and next-of-kin are plaintiffs in this action, and thirty-nine-year-old Mousab Ahmad Khorma, whose estate and next-of-kin is also a plaintiff in this action.  The November 4, 2005 bombings also wounded 110 other people.[28]

30.    Syria provided material support to AQI to help it carry out the Amman bombings, supporting among other efforts AQI's planning, recruitment for, and training for the attack.

### D.    *The Amman Bombings D.C. District Court Action*

31.    On January 9, 2012, Lina Mansoor Thuneibat's and Mousab Ahmad Khorma's estates and family members brought suit against Syria and the Syrian Military Intelligence pursuant to 28 U.S.C. § 1605A of the FSIA and 28 U.S.C. § 1350 of the Torture Victims Protection

---

[25]  *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153 (D.D.C. 2017).

[26]  *Foley*, Dkt. 99.

[27]  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d at 30.

[28]  *Id.*

*(Cont'd on next page)*

Act of 1991 ("TVPA"), for their roles in the Amman Bombings.[29]  The *Thuneibat* plaintiffs successfully served the Syrian defendants pursuant to 28 U.S.C. § 1608(a) and filed proof of service on August 29, 2014.[30]  The Syrian defendants failed to respond and the clerk of the D.C. District Court entered default against them on December 5, 2014.[31]  The *Thuneibat* plaintiffs then moved for default judgment.[32]

32.     The D.C. District Court granted default judgment on March 1, 2016.[33]  The court awarded the *Thuneibat* plaintiffs $347,622,009.[34]  Syria was served with notice of the judgment in accordance with the FSIA on September 22, 2016.[35]

33.     Syria is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it.  The judgment presently remains unsatisfied.

### E.     The Jerusalem Bombing

34.     In August 2001, a bomb was detonated at a Sbarro restaurant in Jerusalem, Israel on behalf of the militant Islamic group, Hamas.[36]

---

[29]  *See generally Thuneibat v. Syrian Arab Republic*, Case No. 12-cv-0020 (D.D.C.) ("*Thuneibat*").

[30]  *Thuneibat*, Dkt. 22.

[31]  *Id.*, Dkt. 24.

[32]  *Id.*, Dkt. 26.

[33]  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016).

[34]  *Id.* at 55.

[35]  *Id.*, Dkt. 35.

[36]  *Suicide bombing at the Sbarro pizzeria in Jerusalem*, Israel Ministry of Foreign Affairs, https://mfa.gov.il/MFA/MFA-Archive/2000/Pages/Suicide%20bombing%20at%20the%20Sbarro%20pizzeria%20in%20Jerusale.aspx; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015).

*(Cont'd on next page)*

35.     Syria provided Hamas with material support and encouragement to carry out the Jerusalem Bombing.

36.     The attack killed 15 people, including 15-year-old U.S. citizen Malka Roth, whose estate and next-of-kin are plaintiffs in this action.  The attack also injured approximately 130 more people.[37]

### F.     *The Jerusalem Bombing D.C. District Court Action*

37.     On July 28, 2011, nine (9) members of the Roth family, including representatives of Malka Roth's estate, filed suit against Syria, the Syrian Air Force Intelligence, Iran, and the Iranian Ministry of Information and Security, pursuant to 28 U.S.C. § 1605A of the FSIA, seeking damages for the injuries and death of Malka Roth.[38]  Plaintiffs were originally unable to serve the Syrian defendants, and the court severed plaintiffs' claims against them.[39]  The D.C. District Court entered judgment against Iran on January 27, 2015.[40]

38.     The *Roth* plaintiffs successfully served the Syrian defendants on July 2, 2017.[41]  The Syrian defendants failed to respond and the clerk of the D.C. District Court entered default against them on September 28, 2017.[42]  The *Roth* plaintiffs then moved for default judgment against the Syrian defendants.[43]

---

[37]  *Id.*

[38]  *See generally Roth v. Islamic Republic of Iran*, Case No. 11-cv-1377 (D.D.C.) ("*Roth I*").

[39]  Order, *Roth v. Islamic Republic of Iran*, Case No. 14-1946 (D.D.C.) ("*Roth II*"), Dkt. 1.

[40]  *Roth I*, Dkt. 43.

[41]  *Roth II*, Dkt. 41.

[42]  *Id.*, Dkt. 43.

[43]  *Id.*, Dkt. 45.

*(Cont'd on next page)*

39.     The D.C. District Court granted default judgment against the Syrian defendants on September 28, 2018.[44]   The court found Syria jointly and severally liable for $18,691,019 in compensatory damages and $56,073,057 in punitive damages.[45]   Syria was served with notice of the judgment in accordance with the FSIA on April 9, 2019.[46]

40.     Syria is jointly and severally liable for the entire amount of the judgment, but has not paid one cent to satisfy it.  The judgment presently remains unsatisfied.

41.     Plaintiffs in this action include all of the plaintiffs named in *Roth* except for Arnold Roth and Haya-Elisheva Roth in their individual capacities, who voluntarily dismissed their claims without prejudice before the D.C. District Court entered judgment against Syria.[47]

## II.     Plaintiffs Are Entitled To Execute On Syrian Assets Located In The United States

42.     Plaintiffs are entitled to execute on Syrian assets in the United States under both federal and New York law in order to satisfy their judgments.  Further, New York law allows for the turnover of assets held on Syria's behalf, wherever located, to the extent held by an entity subject to the jurisdiction of this Court.

43.     Federal Rule 69(a) of the Federal Rules of Civil Procedure allows Plaintiffs to employ New York's judgment enforcement procedures except to the extent federal law applies.

44.     New York law permits a judgment creditor to seek a turnover order requiring (1) a "person in possession or custody of money . . . in which the judgment debtor has an interest," or (2) a "person who is a transferee of money . . . from the judgment debtor" to pay that money to the judgment creditor, "or so much of it as is sufficient to satisfy the judgment."  CPLR 5225.

---

[44]  *Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *1.

[45]  *Id.* at *18.

[46]  *Roth II*, Dkt. 51.

[47]  *Id.*, Dkt. 44.

45.     The FSIA also enables Plaintiffs to execute on Syrian assets in the United States where the assets are "used for a commercial activity in the United States." 28 U.S.C. § 1610(a).

46.     Because Plaintiffs are the victims of terrorist acts, the FSIA allows Plaintiffs to execute on not only Syrian property, but also property owned by any of its agencies or instrumentalities.  *See* 28 U.S.C. § 1610(g).

47.     In addition, the TRIA enables plaintiffs who have "obtained a judgment against a terrorist party on a claim based on an act of terrorism" to execute or attach in the aid of execution "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) . . . in order to satisfy such judgment."  TRIA § 201(a), Pub. L. 107-297, 116 Stat. 2322, 2340 (Nov. 26, 2002).  Syria and any of its government agencies and instrumentalities qualify as a "terrorist party" under the TRIA.

48.     Plaintiffs are entitled to execute against Syria's assets under each of these statutes, including Syrian assets held by or controlled by UBAF.  The assets that Syria funneled to UBAF and then into and out of the U.S. financial system all belong to Syria or financial institutions that act as Syria's agent, instrumentality, or alter ego—which are liable for Syria's terrorism judgments as a matter of federal law.  Once the Syrian assets were secreted into New York, they were used for commercial purposes, including effectuating U.S. Dollar-denominated transactions.

49.     Under U.S. sanctions, these assets were blocked property of Syria.  And had they been detected as assets of Syria or its agent and instrumentality—as they would have, absent Syria's efforts to obscure the true nature of the initial, underlying transactions, and UBAF's knowing facilitation of that scheme—they would have been subject to attachment and execution by Plaintiffs.

**III.    Syria And UBAF Disguised Syria's Involvement In The U.S. Financial Markets To Allow Syria To Avoid Paying Its Debts**

50.     To date, Plaintiffs have not been able to execute on Syrian assets in the United States.  This is because Syria and UBAF have intentionally obfuscated Syrian assets that were located within the United States, thereby preventing Plaintiffs from locating those assets.  These efforts were notably in direct contravention of U.S. sanctions imposed against Syria and defeated decades of Congressional lawmaking designed to help victims of terrorism to both bring suit against their tormentors and to execute against their assets.

***A.     To Evade Plaintiffs, Syria and UBAF Had To Circumvent the U.S. Sanctions Regime***

51.     U.S. law prohibits any U.S. person, including financial institutions inside the United States, from providing services directly or indirectly to Syria or the Government of Syria, in the absence of a license from OFAC.  This prohibition includes the unlicensed processing of transactions through U.S. banks that are for the benefit of the Government of Syria, including any agency or instrumentality of the Government of Syria or any entity owned or controlled by the Government of Syria.

52.     The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701, *et seq*. authorizes the President of the United States "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority to "investigate, regulate, or prohibit . . . any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities by any

14

person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(A). The United States first imposed sanctions on Syria in 1979, when Syria was added to the U.S. Department of State's list of State Sponsors of Terrorism.[48]

53.     In 2003, Congress passed the Syrian Accountability and Lebanese Sovereignty Restoration Act of 2003 ("SAA") to "halt support for terrorism, end its occupation of Lebanon, and stop its development of weapons of mass destruction, and by so doing hold Syria accountable for the serious international security problems it has caused in the Middle East, and for other purposes."[49]

54.     Subsequently, on May 11, 2004, the President issued Executive Order 13338, declaring a national emergency in light of Syria's "supporting terrorism, continuing its occupation of Lebanon, pursuing weapons of mass destruction and missile programs, and undermining United States and international efforts with respect to the stabilization and reconstruction of Iraq. . . ."[50] Executive Order 13338 prohibited the exportation or reexportation to Syria of any item on the U.S. Munitions List or Commerce Control List, the latter with some exceptions.  On April 5, 2005, OFAC issued the Syrian Sanctions Regulations ("SSR") implementing Executive Order 13338.[51]

55.     From 2005 to 2011, the President issued several executive orders expanding the scope of the national emergency declared in Executive Order 13338.  In addition, on June 28,

---

[48]   State Sponsors of Terrorism, U.S. DEP'T OF STATE, https://www.state.gov/state-sponsors-of-terrorism (last visited Jan. 19, 2021).

[49]   Syria Accountability and Lebanese Sovereignty Restoration Act of 2003 [SAA], Pub. L. No. 108-175, 117 Stat. 2482.

[50]   Exec. Order No. 13338, 69 Fed. Reg. 26749 (May 11, 2004).

[51]   70 Fed. Reg. 17203 (Apr. 5, 2005), 31 C.F.R. § 542.

*(Cont'd on next page)*

2005, the President issued Executive Order 13382 blocking the property of designated proliferators of weapons of mass destruction and members of their support networks.[52]

56.     Beginning in 2011, the United States increasingly relied on sanctions "to deprive the [Syrian] regime of the resources it needs to continue violence against civilians and to pressure the Syrian regime to allow for a democratic transition as the Syrian people demand."[53]

57.     In support of these efforts, on August 17, 2011, the President issued Executive Order 13582, "blocking" the Syrian government's and its agents' property and interests in the United States and in U.S. person's overseas branches, as well as the property and interests of anyone who "materially assisted, sponsored, or provided financial, material, or technological support for" the government of Syria or its agents, and prohibiting:

    a.    "new investment in Syria by a United States person, wherever located";

    b.    "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any services to Syria";

    c.    "the importation into the United States of petroleum or petroleum products of Syrian origin";

    d.    "any transaction or dealing by a United States person, wherever located, including purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing, in or related to petroleum or petroleum products of Syrian origin"; and

    e.    "any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this section if performed by a United States person or within the United States."[54]

---

[52]  Exec. Order No. 13382, 70 Fed. Reg. 38565 (June 28, 2005).

[53]  Syria Sanctions, U.S. DEP'T OF STATE, https://www.state.gov/syria-sanctions/ (last visited Jan. 19, 2021).

[54]  Exec. Order 13582, 76 Fed. Reg. 52209 (Aug. 17, 2011).

58.     Executive Order 13582 also prohibited "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to [Executive Order 13582]," and "the receipt of any contribution or provision of funds, goods, or services from any such person."[55]

59.     On May 1, 2012, the President issued Executive Order 13608 in response to efforts to evade U.S. economic and financial sanctions with respect to Iran and Syria.  Executive Order 13608 expanded the prohibitions under previous and future executive orders relating to Syria to foreign persons, and gave the U.S. government the authority to impose sanctions on foreign persons who have "facilitated deceptive transactions for or on behalf of any person subject to United States sanctions concerning Iran or Syria."[56]

60.     Syria has consistently responded to these and other restrictions imposed by the U.S. government with defiance, and has vocalized its commitment to devoting significant resources to circumvent these sanctions and restrictions.  As just one example, after the Trump administration issued new sanctions on Syria in 2019, Syrian Foreign Minister Walid Muallem vowed that Syria would circumvent the sanctions:  "If they (Washington) dreamt that Syria and its people would bow to their conditions, then I would say let them keep dreaming because this will never happen."[57]  Similarly, in 2020, Syrian businessman and Syrian President Bashar al Assad's uncle, Rami

---

[55]  *Id.*

[56]  Exec. Order 13608, 77 Fed. Reg. 26407 (May 3, 2012).

[57]  *Syria refuses to 'bow' to US sanctions, says foreign minister*, THE NEW ARAB (June 23, 2020), https://english.alaraby.co.uk/english/news/2020/6/23/syria-refuses-to-bow-to-us-sanctions.

*(Cont'd on next page)*

Makhlouf, proudly proclaimed on Facebook that he had set up a web of offshore front companies to help Syria evade Western sanctions.[58]

### B.      UBAF Received Syrian Assets as Part of Syria's Fraud on Plaintiffs and the U.S. Financial System

61.      As a result of the above-described sanctions regime, Syria knew that any transactions involving its funds would be blocked the moment those funds were received by U.S. financial systems and that such blocked property would be subject to attachment and, ultimately, execution by the holders of terrorism judgments against Syria.  Therefore, Syria sought to partner with a foreign financial institution that would disguise its asset flows into and out of financial systems in the United States so as to avoid the blocking of its transactions or seizure of its assets. Syria ultimately chose to partner with UBAF, and to specifically use UBAF's accounts to transfer assets into and out of the United States.

62.      Syria also knew from its litigation against U.S. victims of terrorism and its experience in losing assets to these judgment holders that its assets could, if discovered, be seized in the United States.

63.      UBAF, with the knowledge of senior management, joined this fraudulent scheme orchestrated by Syria.  To evade the IEEPA and SSR, Syria transferred funds worth billions of U.S. dollars to UBAF with the intent to fraudulent evade U.S. sanctions and Plaintiffs' claims. UBAF knowingly received and laundered these Syrian funds.  As part of this process, UBAF converted Syrian Pound payments into U.S. Dollars so that Syrian funds could be—and were— transferred to individuals and entities around the world, including the United States, using UBAF's

---

[58] Suleiman Al-Khalidi, *Syrian tycoon says front companies used to dodge sanctions as rift with Assad widens*, REUTERS: WORLD NEWS (July 26, 2020), https://www.reuters.com/article/us-syria-security-tycoon/syrian-tycoon-says-front-companies-used-to-dodge-sanctions-as-rift-with-assad-widens-idUSKCN24S06Z.

New York correspondent accounts.

64.     Syria and UBAF purposefully directed transfers to and through New York to effectuate the fraudulent scheme.  UBAF processed these transfers knowingly, and took concrete steps to ensure that these transfers were effectuated.

65.     Thus, between at least August 2011 and August 2013, UBAF received funds worth billions of U.S. Dollars from Syria and its instrumentalities and processed at least 127 transactions involving the U.S. banking system, totaling more than $2 billion, all in violation of U.S. sanctions laws.[59]  UBAF and Syria employed two different methods to evade U.S. sanctions and transfer Syrian funds through New York banks:  the Internal Fund Transfer Scheme and Letter of Credit Scheme.

### 1.     The Internal Fund Transfer Scheme

66.     In connection with Syria's efforts to avoid U.S. sanctions, UBAF knowingly processed 114 internal transfers on behalf of sanctioned Syrian entities totaling nearly $1.3 billion. These internal transfers were then followed by approximately 114 corresponding fund transfers through a U.S. bank.[60]

67.     Through the Internal Fund Transfer Scheme, UBAF knowingly processed forty-five U.S. Dollar transfers between a sanctioned Syrian entity and a non-sanctioned client on its own books.[61]  UBAF then processed the non-sanctioned client's transfers for the same or similar amounts that cleared a U.S. bank.[62]

---

[59]  T.D. Enf't Release (Jan. 4, 2021), *available at*
      https://home.treasury.gov/system/files/126/01042021_UBAF.pdf.

[60]  *Id.*

[61]  *Id.*

[62]  *Id.*

*(Cont'd on next page)*

68.     In the remaining sixty-nine internal transfers, UBAF "conducted a foreign exchange (FX) transaction with a sanctioned Syrian customer on UBAF's books, debiting an account in one currency and crediting the same sanctioned customer's account in another currency. UBAF then conducted a U.S.-cleared FX transaction with a non-sanctioned third party that correlated closely with the original FX transaction involving the sanctioned customer."[63]

69.     By so doing, UBAF effectively hid the true counterparty of these transactions, stripping references to sanctioned Syrian entities so that Syrian funds could enter and transit through New York banks while avoiding U.S. scrutiny, which would have led to seizure of the funds and, ultimately, attachment of those funds in satisfaction of Plaintiffs' judgments.

### 2.     The Letter of Credit Scheme

70.     The Letter of Credit Scheme involved a total of thirteen transactions.

71.     As part of the "back-to-back" letter of credit transactions, "a sanctioned Syrian entity was the beneficiary of export letters of credit or the applicant for import letters of credit that did not involve [U.S. Dollar] clearing, but the intermediary entered into or received one or more corresponding [U.S. Dollar] letters of credit to purchase or sell the same goods."[64]

72.     In still other letter of credit transactions, "UBAF either issued a [U.S. Dollar]-denominated letter of credit on behalf of a sanctioned party or confirmed a [U.S. Dollar]-denominated letter of credit issued by a sanctioned bank and paid on the letter of credit through a U.S.-cleared transaction."[65]

---

[63]  *Id.*

[64]  *Id.*

[65]  *Id.*

IV.  **UBAF Was Aware Of And Benefited From The Fraudulent Transfers Of Syrian Assets, And Exercised Control And Dominion Over The Accounts Necessary To Execute Syria's Fraudulent Conveyances**

73.  UBAF was a full and willing participant in the fraudulent schemes set up to flout U.S. sanctions against Syria.

74.  Senior management and officials at UBAF were aware of Syria's scheme to fraudulently transfer funds owned by Syria and its instrumentalities to UBAF and further transfer U.S. Dollars by transferring those funds into UBAF correspondent accounts in New York.  Indeed, UBAF worked closely with Syria and its agencies and instrumentalities to execute and conceal the fraudulent conveyances.

75.  UBAF meaningfully benefitted from the schemes that allowed Syria to disguise and funnel over $2 billion worth of funds to its agents for the express purpose of violating U.S. sanctions.  Among other things, UBAF received substantial commissions, fees, revenues, and additional business by cooperating with Syria and permitting Syria's funds to unlawfully flow from Syria to UBAF accounts in New York, in violation of U.S. law.  UBAF further benefited through its ability to use Syrian funds while those funds were in UBAF's possession.

V.  **The U.S. Department Of Treasury Found UBAF Violated U.S. Sanctions Against Syria**

76.  On January 4, 2021, the U.S. Department of Treasury announced an $8,572,500 settlement with UBAF for 127 violations of the Syria sanctions program.[66]  The statutory maximum civil monetary penalty was $4,158,679,887.04.[67]

77.  Importantly, OFAC found the following aggravating factors:

---

[66]  T.D. Enf't Release (Jan. 4, 2021), *available at* https://home.treasury.gov/system/files/126/01042021_UBAF.pdf.

[67]  *Id.*

a.   "UBAF demonstrated a reckless disregard for its U.S. sanctions compliance obligations when it continued to provide [U.S. Dollar] services to sanctioned Syrian parties after the August 2011 expansion of U.S. sanctions on Syria without properly identifying and managing the relevant sanctions compliance risks that providing those services posed to the bank";

b.   UBAF management had actual knowledge of the conduct giving rise to the Apparent Violations"; and

c.   "UBAF conferred significant economic benefit to U.S.-sanctioned parties and caused significant harm to the integrity of U.S. sanctions programs and their associated policy objectives."[68]

78.   OFAC, however, ultimately reduced the penalty on the basis that UBAF—branches of which reportedly had previously been under investigation for facilitating oil sales by sanctioned countries, including Iran and Libya in addition to Syria—(belatedly) self-disclosed the violations.[69]

## VI.   UBAF's Willful Participation In The Schemes Enabled The Execution Of International Payments Using The Funds Otherwise Due To Plaintiffs

79.   UBAF's receipt and re-transfer of the Syrian funds knowingly and intentionally caused at least $2 billion of Syrian funds to pass through UBAF's U.S. correspondent accounts located in New York.  These transactions were in direct violation of U.S. sanctions.  Moreover, these transactions were made while Syria was a defendant in Plaintiffs' lawsuits.

## <u>CLAIMS FOR RELIEF</u>

### FIRST COUNT

### (Against UBAF for Rescission and Turnover of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law § 273-a)

80.   Plaintiffs incorporate herein by reference paragraphs 1 through 79, *supra*, as if fully set forth herein.

---

[68]   *Id.*

[69]   *Id.*

81.     Syria, through sanctioned Syrian financial institutions, fraudulently conveyed more than $2 billion to UBAF in bad faith with the express intention of laundering these funds in order to convert Syrian Pound denominated funds to U.S. Dollars and transfer those funds into the world's financial markets in violation of U.S. sanctions.  UBAF willingly and knowingly received fraudulent transfers from Syria and participated in and benefited from the fraudulent schemes to fraudulently divert Syrian assets owed to Plaintiffs to accounts under other individuals' and entities' control.  Though this scheme, UBAF enabled the government of Syria and its agencies, instrumentalities, and alter egos to engage in illicit financial transactions that violated U.S. sanctions and exploited the U.S. financial system.

82.     UBAF knowingly accepted the fraudulent transfers and benefitted by receiving substantial commissions for its role in the schemes, earning fees and revenues that would have been unavailable to it absent the transfers at issue, as well as the use of the money while Syria's funds were in UBAF's possession.  UBAF also benefitted from its participation in and execution of the schemes by concealing them from U.S. regulators for years so that it could maintain its access to the U.S. financial system and its U.S. correspondent banking accounts while profiting from its relationship with Syria and its instrumentalities.  UBAF only belatedly disclosed the existence of this scheme in an attempt to minimize the financial penalties that the U.S. government would impose for UBAF's violations of U.S. law.

83.     The conveyances of Syrian funds to UBAF were made without fair consideration because they were made with the intent to defraud creditors and the U.S. government, were in direct violation of U.S. sanction law, and were not conducted in good faith.  In addition, fraudulent conveyances of Syrian funds that were directed from UBAF to third-party beneficiaries through UBAF's U.S. correspondent accounts were made without fair consideration because they were

made with the intent to defraud creditors and the U.S. government, were in direct violation of U.S. sanction law, and were not conducted in good faith.

84.     Syria directed numerous fraudulent transfers of the funds to and out of UBAF accounts in bad faith with the express intent that the true nature and purpose of those funds be concealed before they were converted to U.S. Dollars and used to execute international financial transactions, including at least $2 billion in transfers that were deliberately routed through UBAF's correspondent accounts in New York.

85.     Syria and UBAF failed to deal honestly, fairly and openly when they induced U.S. financial institutions to provide financial services for the government of Syria in violation of sanctions laws.  By evading detection, Syria, and UBAF, intentionally evaded Plaintiffs' legitimate claims to the transferred funds.

86.     To execute these schemes while evading Plaintiffs' claims and U.S. sanctions. Syria knew and intended that UBAF would deliberately fail to implement compliance systems that would identify suspicious or unlawful transactions.  Syria also knew that UBAF would allow its fraudulent conveyances to occur without raising any red flags that would subject the transfers to more careful review.

87.     Syria knew and intended that UBAF's deliberate failure to abide by U.S. banking regulations would hinder and delay the U.S. Treasury's ability to discover that Syria was, in fact, laundering nearly $2 billion through UBAF and into the U.S. financial system at institutions in New York.  Syria also knew and intended that UBAF's actions would, and did, further cause significant harm to the integrity of U.S. sanctions programs and their associated policy objectives. UBAF's receipt of the Syrian money and its decision to launder those funds shielded $2 billion of Syrian assets from potential execution by Plaintiffs in the United States.

88.     At the time Syria made the fraudulent transfers, Syria was a defendant in the actions initiated by the *Foley*, *Roth*, and *Thuneibat* plaintiffs in the D.C. District Court.  Those actions resulted in final judgments against Syria in the amounts of $109,279,469 to the *Foley* plaintiffs, $74,764,076 to the *Roth* plaintiffs, and $347,622,009 to the *Thuneibat* plaintiffs.

89.     Syria has failed to satisfy the judgments.

90.     The transfers of Syria's funds through UBAF accounts and then to UBAF's correspondent accounts in New York were made with knowledge of Plaintiffs' claims and during the pendency of Plaintiffs' lawsuits.  The transfers, which were designed to evade U.S. sanctions and did not have a legitimate business purpose, were not made in good faith.  Because Syria has failed to satisfy Plaintiffs' judgments, Syria's conveyances were fraudulent as to Plaintiffs under New York Debtor and Creditor Law Section 273-a.

91.     As a result of the fraudulent nature of the transactions, Plaintiffs are entitled to an order setting aside the conveyances and causing UBAF to turn over the transferred property to Plaintiffs.

92.     Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in UBAF's possession, Plaintiffs are entitled to an order requiring UBAF to pay money damages to Plaintiffs in the amount of the judgments.

93.     Furthermore, as a result of UBAF's reckless, gross and wanton conduct, namely knowingly permitting sanctions-violating transactions to occur and failing to implement systems that might detect such unlawful transactions, Plaintiffs are entitled to an order requiring UBAF to pay punitive damages in the amount of the judgments.

**SECOND COUNT**

**(Against UBAF for Rescission and Turnover of Fraudulent
Conveyances in Violation of New York Debtor and Creditor Law Section 276)**

94.     Plaintiffs incorporate herein by reference paragraphs 1 through 93, *supra*, as if fully set forth herein.

95.     Syria fraudulently conveyed funds to accounts at UBAF so that it could use the funds to conduct international financial transactions.  Syria transferred or caused to be transferred funds into UBAF accounts outside the ordinary course of business, because Syria knew UBAF would receive and transfer on the Syrian funds.

96.     As Syria intended, UBAF worked with Syria and its agents to transfer funds and benefited from the fraudulent scheme to fraudulently divert Syrian assets owed to Plaintiffs into and out of the accounts at UBAF to other UBAF accounts and eventually to third-party beneficiaries through U.S. correspondent accounts.  This scheme violated U.S. sanctions, and exploited the U.S. financial system.  Both separately and collectively, these transactions bear a number of badges of fraud, including, but not limited to, the fact that the transfers took place while Syria was a defendant in Plaintiffs' lawsuits, the transfers lacked adequate consideration, the transfers were in direct violation of U.S. sanctions law, Syria retained the use of the funds after the fraudulent transfers was complete, and Syria knew of Plaintiffs' claims at the time the transfers occurred.

97.     Syria and UBAF effectuated the fraudulent schemes with the intention of evading attachment and execution of Syria's property by Plaintiffs, as well as hindering and delaying U.S. Treasury's ability to administer sanctions.  Syria defrauded U.S. regulators through transfers to and from accounts at UBAF with the specific intent that the funds would be converted to U.S. Dollars and transferred into the U.S. financial system in fabricated conformance with U.S.

sanctions laws, thereby providing Syria access to U.S. Dollar-denominated funds and the U.S. financial system.

98.     At the time Syria made the fraudulent transfers, Syria was a defendant in the actions initiated by the *Foley*, *Roth*, and *Thuneibat* plaintiffs in the D.C. District Court.  Those actions resulted in final judgments against Syria in the amounts of $109,279,469 to the *Foley* plaintiffs, $74,764,076 to the *Roth* plaintiffs, and $347,622,009 to the *Thuneibat* plaintiffs.

99.     Syria has failed to satisfy the judgments.

100.     As a result of the fraudulent nature of the transactions, Plaintiffs are entitled to an order setting aside the conveyances and causing UBAF to turn over the transferred property to Plaintiffs.

101.     Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in UBAF's possession, Plaintiffs are entitled to an order requiring UBAF to pay money damages to Plaintiffs in the amount of the judgments.

102.     Furthermore, as a result of UBAF's reckless, gross and wanton conduct, namely knowingly permitting sanctions-violating transactions to occur and failing to implement systems that might detect such unlawful transactions, Plaintiffs are entitled to an order requiring UBAF to pay punitive damages in the amount of the judgments.

### THIRD COUNT

### (Against UBAF for Turnover Pursuant to CPLR 5225)

103.     Plaintiffs incorporate herein by reference paragraphs 1 through 102, *supra*, as if fully set forth herein.

104.     Section 5225(b) of the CPLR states, in relevant part, that a court "shall require a . . . person in possession or custody of money . . . in which the judgment debtor has an interest or

. . . a person who is a transferee of money . . . from the judgment debtor . . . to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor."

105.    Pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and CPLR 5225, Plaintiffs respectfully request that the Court enforce Plaintiffs' judgments against Syria by issuing an order conveying, assigning, and directing the payment to Plaintiffs of all rights, title, and interest of Syria in any Syrian assets that remain in the possession of UBAF, up to the amount of such judgments.

## FOURTH COUNT

### (Against UBAF for Turnover Pursuant to the Terrorism Risk Insurance Act)

106.    Plaintiffs incorporate herein by reference paragraphs 1 through 105, *supra*, as if fully set forth herein.

107.    The TRIA provides that "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable."  TRIA § 201(a).

108.    Syria has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning December 29, 1979, and therefore is a "terrorist party" as defined by TRIA, § 201(a).

109.    In Executive Order 13582, the President invoked his IEEPA authority and "blocked" "[a]ll property and interests in property that are in the United States that hereafter come

within the United States, or that are or hereafter come within the possession or control of any United States person, including any overseas branch, of the Government of Syria."[70]

110.    Plaintiffs hold judgments for compensatory damages against Syria based on acts of terrorism under 28 U.S.C. § 1605A.

111.    Had UBAF not knowingly facilitated Syria's concealment of its assets that traveled through the U.S. financial system, those assets would have been blocked pursuant to Execute Order 13582, and thus subject to execution by the Plaintiffs.

112.    Plaintiffs are thus entitled to an order directing UBAF to turn over any remaining Syrian funds in full or partial satisfaction of the compensatory damages awarded in the judgments.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.    Enter an order rescinding, or setting aside, the fraudulent conveyances made by Syria to accounts at UBAF and requiring UBAF to turn over the fraudulently transferred assets to Plaintiffs up to the amount of Plaintiffs' judgments, including pre- and post-judgment interest;

2.    Enter an order requiring UBAF to pay Plaintiffs monetary damages in the amount of Plaintiffs' judgments or the amount of the fraudulently conveyed funds if less, including pre- and post-judgment interest, to the extent that the fraudulently transferred assets no longer exist or are no longer in UBAF's possession;

3.    Enter an order directing UBAF to turn over any asset of Syria currently within its possession, up to the amount of Plaintiffs' judgments against Syria;

4.    Enter an order requiring UBAF to pay Plaintiffs' punitive damages;

---

[70]  Exec. Order 13582, 76 Fed. Reg. 52209 (Aug. 17, 2011).

5.      Enter an order enjoining UBAF from taking any action to transfer, dispose of, encumber, or otherwise reduce or jeopardize Plaintiffs' interest in Syrian assets;

6.      Order payment of Plaintiffs' attorneys' fees and expenses; and

7.      Award Plaintiffs other and further relief the Court deems just and proper.

Dated:  February 28, 2021                 Respectfully submitted,


                                           /s/  *Robert L. Weigel*

                                          Robert L. Weigel
                                          Robert F. Serio
                                          Jason W. Myatt
                                          Declan T. Conroy
                                          GIBSON, DUNN & CRUTCHER LLP
                                          200 Park Avenue
                                          New York, NY  10166
                                          Telephone:  (212) 351-4000
                                          Facsimile:  (212) 351-4035
                                          rweigel@gibsondunn.com
                                          jmyatt@gibsondunn.com

                                          *Attorneys for Plaintiffs*