UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VIRGINIA FOLEY, ET AL.,

                              Plaintiffs,

              – *against* –

UNION DE BANQUES ARABES ET
FRANÇAISES,

                              Defendant.

**OPINION & ORDER**

22-cv-1682 (ER)

---

RAMOS, D.J.:

Plaintiffs—thirty victims and family members of victims of acts of terrorism sponsored by the Syrian Arab Republic ("Syria"), all of whom have obtained final judgments against Syria for damages—bring this suit against Union de Banques Arabes et Françaises ("UBAF") for allegedly working with Syria to evade U.S. sanctions and thereby prevent Plaintiffs from executing on Syrian assets to satisfy Plaintiffs' judgments. Doc. 1 ("Compl."). Plaintiffs bring claims for constructive and actual fraudulent conveyance under New York law (N.Y. Debt. & Cred. L. § 273-a and § 276, respectively), as well as for turnover under both New York (CPLR § 5225) and federal law (Terrorism Risk Insurance Act ("TRIA"), 28 U.S.C. § 1610 note). *Id.*

Before the Court is UBAF's motion to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). Doc. 20. For the following reasons, UBAF's motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.  Plaintiffs and the Underlying Actions Against Syria

Since 1979, the U.S. Department of State has continuously designated Syria a state sponsor of terrorism for its support of Hamas, al-Qaeda in Iraq ("AQI"), and other terrorist and militant organizations. Compl. ¶ 3. Syria has provided material support to AQI's terrorist activities, including by providing safe haven, weaponry, financial support,

and apparent impunity.  *Id.* ¶¶ 23–24.  Syria is also alleged to have provided material support and encouragement to AQI and Hamas to carry out bombings.  *Id.* ¶¶ 30, 35.

    1.  <u>*Roth v. Islamic Republic of Iran*</u>, *No. 11-cv-1377 (D.D.C.)*

In August 2001, Hamas detonated a bomb at a Sbarro restaurant in Jerusalem, Israel, which killed 15 people and injured 130 people.  *Id.* ¶¶ 34, 36.  Among those killed in the Jerusalem bombing was 15 year-old Malka Roth.  *Id.* ¶ 36.

The estate and family of Roth (Estate of Malka Chana Roth, Frimet Roth, Pesia Roth, Rivka Roth Rappaport, Zvi Nehemia Roth, Shaya Elazar Roth, and Pinchas Moshe Roth) filed suit[1] against Syria, the Syrian Air Force Intelligence, Iran, and the Iranian Ministry of Information and Security in the D.C. District Court on July 28, 2011, pursuant to 28 U.S.C. § 1605A of the Foreign Sovereign Immunities Act ("FSIA").  *Id.* ¶ 37.  The *Roth* plaintiffs were unable to serve the Syrian defendants until July 2, 2017.[2]  *Id.* ¶ 38.

By September 28, 2017, the Syrian defendants had not responded, and the clerk of court entered a certificate of default against them.  *Id.*  The *Roth* plaintiffs moved for default judgment, and the D.C. District Court granted default judgment against the Syrian defendants on September 28, 2018, holding Syria jointly and severally liable for $18,691,019 in compensatory damages, and $56,073,057 in punitive damages.  *Id.* ¶¶ 38–39.  Syria was served with notice of the judgment on April 9, 2019.  *Id.* ¶ 39.  It has not made any payments on the judgment, which remains unsatisfied.  *Id.* ¶ 40.

    2.  <u>*Foley v. Syrian Arab Republic*</u>, *No. 11-cv-699 (D.D.C.)*

On October 28, 2002, AQI shot and killed Laurence Foley, an agent with the United States Agency for International Development assigned to Amman, Jordan.  *Id.*

---

[1] Arnold Roth and Haya-Elshiva Roth were also plaintiffs in *Roth*, but they voluntarily dismissed their claims in *Roth* without prejudice and are accordingly not plaintiffs to this action.  *Id.* ¶ 41.  All other *Roth* plaintiffs are also Plaintiffs here.

[2] Because the *Roth* plaintiffs were able to serve the Iranian defendants on September 16, 2012 (*Roth*, Doc. 19), the D.C. District Court severed plaintiffs' claims against them in 2014 and entered judgment against Iran on January 27, 2015 (Compl. ¶ 37).

¶ 19.  On April 9, 2004, AQI abducted, tortured, and executed Staff Sergeant Keith Mathew Maupin after ambushing his convoy west of Baghdad, Iraq.  *Id.* ¶ 20.  On June 16, 2006, AQI abducted Private First Class Kristian Menchaca while he manned his observation post in Iraq and thereafter tortured and killed him.  *Id.* ¶ 21.

The estates and families of Foley (Estate of Laurence Michael Foley, Virginia Foley, Megan Foley, Jeremie Foley Robenolt, and Laurence Michael Foley, Jr.); Maupin (Estate of Keith Matthew Maupin, Carolyn J. Maupin, and Keith Maupin); and Menchaca (Estate of Kristian Menchaca, Christina Menchaca, Pedro Menchaca, Maria Guadalupe Vasquez, and Julio Cesar Vasquez Menchaca) filed suit[3] against Syria, the Syrian Military Intelligence, President Bashar al-Assad, and General Asif Shawkat in the D.C. District Court on April 8, 2011, pursuant to § 1605A of the FSIA.  *Id.* ¶ 22.  The *Foley* plaintiffs served defendants on January 22, 2015.  *Id.*

By January 22, 2016, defendants had not responded, and the clerk of the court entered a certificate of default against them.  *Id.*  The D.C. District Court held a liability hearing on November 16 and 17, 2016 and granted default judgment as to liability on April 13, 2017.  *Id.*  A special master administered damages proceedings and issued a report and recommendation, which the court reviewed and awarded the *Foley* plaintiffs $109,279,469 in damages on December 21, 2017.  *Id.* ¶ 26.  Syria was served with notice of the judgment on June 20, 2018.  *Id.*  It has not made any payments on the judgment, which remains unsatisfied.  *Id.* ¶ 27.

3. *Thuneibat v. Syrian Arab Republic, No. 12-cv-20 (D.D.C.)*

On November 4, 2005, AQI was responsible for suicide bombings of Radisson SAS, the Grand Hyatt, and the Days Inn hotels in Amman, Jordan, which killed 57 civilians and wounded 110 people.  *Id.* ¶ 29.  Among those killed in the Amman

---

[3] Julietta and Kenneth MacKenzie and Isaac Murillo were also plaintiffs in *Foley*, but they were not awarded damages in *Foley* and are accordingly not plaintiffs in this action.  *Id.* ¶ 28.  All other *Foley* plaintiffs are also plaintiffs here.

bombings were 9 year-old Lina Mansoor Thuneibat and 39 year-old Mousab Ahmad Khorma. *Id.*

The estates and family members of Thuneibat (Estate of Lina Mansoor Thuneibat, Nadira Thuneibat, Estate of Mansoor Al-Thuneibat, Omar Mansoor Thuneibat, and Muhammad Mansoor Thuneibat) and Khorma (Estate of Mousab Ahmad Khorma, Tariq Ahmad Khorma, Estate of Samira Fayez Khorma, Tatsiana Ahmad Khorma, and Zeid Ahmad Khorma) filed suit against Syria and the Syrian Military Intelligence in the D.C. District Court on January 9, 2012, pursuant to § 1605A of the FSIA and 28 U.S.C. § 1350 of the Torture Victims Protection Act of 1991. *Id.* ¶ 31. The *Thuneibat* plaintiffs successfully served defendants and filed proof of service on August 29, 2014. *Id.*

By December 5, 2014, defendants had not responded, and the clerk of court entered a certificate of default against them. *Id.* The *Thuneibat* plaintiffs moved for default judgment, and the D.C. District Court granted default judgment on March 1, 2016, awarding plaintiffs $347,622,009. *Id.* ¶¶ 31–32. Syria was served with notice of the judgment on September 22, 2016. *Id.* ¶ 32. It has not made any payments on the judgment, which remains unsatisfied. *Id.* ¶ 33.

**B.  Syria, UBAF, Sanctions, and the Alleged Scheme to Evade Sanctions**

Under U.S. law, judgment creditors may execute on defendant debtors' assets to satisfy the creditors' judgments. *See* Fed. R. Civ. P. 69(a)(1) (providing that the procedure for execution to enforce a money judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies"). Plaintiffs allege that federal and New York law entitles them—as plaintiffs to *Roth*, *Foley*, and *Thuneibat* (together, "Plaintiffs' Underlying Actions") who have obtained money judgments—to execute on assets, held in the United States, of Syria and its agencies or instrumentalities, as well as those Syrian assets abroad held by an entity subject to the jurisdiction of New York. Compl. ¶¶ 42–49. Plaintiffs allege, however, that Syria and UBAF colluded to contravene U.S. sanctions to "intentionally obfuscate[] Syrian assets

that were located within the United States" and prevent Plaintiffs from locating and executing on them.  *Id.* ¶ 50.

     *1.  The Sanctions Regime Against Syria*

     Since 2005, Syria has been the subject of sanctions aimed to halt its support for terrorism, hold it accountable for its role in destabilizing the region and creating international security problems, deprive it of resources needed to perpetrate violence against its citizens, and pressure the Syrian regime into a democratic transition.  *See id.* ¶¶ 54–59.  These sanctions prohibit any U.S. person from directly or indirectly providing services—including unlicensed processing banking transactions through financial institutions inside the United States—to Syria, its agencies or instrumentalities, or any entity owned or controlled by Syria.  *Id.* ¶ 51.  Thus, under the sanctions regime, transactions involving Syrian funds must be blocked when received by U.S. financial systems.  *Id.* ¶ 61.

     Moreover, the TRIA provides that plaintiffs with "a judgment against a terrorist party on a claim based upon an act of terrorism" may execute, or attach in aid of execution, "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) . . . in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable."  TRIA § 201(a).  Syria, as a designated state sponsor of terrorism, falls within the meaning of a "terrorist party."  Compl. ¶ 47; *see also* TRIA § 201(d).  Plaintiffs therefore allege they are entitled to attach and execute against Syria's blocked assets, including any Syrian funds received by U.S. financial institutions.  *Id.* ¶¶ 48–49.

     *2.  Syria's Evasion of U.S. Sanctions*

     Plaintiffs allege Syria was consequently aware that, pursuant to the U.S. sanctions regime, its funds would be blocked as soon as they were received by U.S. financial institutions.  *Id.* ¶ 61.  And Syria knew from prior litigation by victims of terrorism against it that, as soon as its assets were discovered, they could be subject to attachment

and execution.  *Id.* ¶¶ 61–62.  Syria therefore set out to evade the sanctions.  *Id.* ¶ 61. Specifically, Plaintiffs allege Syria partnered with a foreign financial institution, UBAF, to disguise its flow of assets into and out of the U.S. financial system to fraudulently avoid blocking and seizure.  *Id.*

UBAF is a foreign financial institution organized under the laws of France and headquartered in Paris.  *Id.* ¶ 17.  It maintains branch offices in Tokyo, Seoul, and Singapore, as well as branch offices in Cairo, Dubai, Algiers, and Dhaka.  *Id.*  UBAF utilizes correspondent bank accounts[4] all over the world, including in New York.  *Id.*

On January 4, 2021, the U.S. Department of Treasury ("the Treasury") announced an approximately $8.5 million settlement with UBAF for 127 violations of Syrian sanctions.  *Id.* ¶ 76.  The Treasury found that UBAF had demonstrated a "reckless disregard for its U.S. sanctions compliance obligations," and UBAF management had "actual knowledge of the conduct giving rise" to the violations.  *Id.* ¶ 77 (quoting U.S. Dep't of Treasury, *Enforcement Release: OFAC Enters Into $8,572,500 Settlement with Union de Banques Arabes et Françaises for Apparent Violations of Syria-Related Sanctions Program* (Jan. 4, 2021))[5] ("Enforcement Release")).

"[W]ith the knowledge of senior management," UBAF "purposefully" and "knowingly received and laundered" Syrian funds through UBAF's New York correspondent accounts as part of the "fraudulent scheme orchestrated by Syria."  Compl. ¶ 63–64.  Between August 2011 and August 2013, UBAF processed at least 127

---

[4] "Correspondent accounts are accounts in domestic banks held in the name of [] foreign financial institutions.  Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions.  Without correspondent banking . . . it would often be impossible for banks to provide comprehensive nationwide and international banking services—among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries."  *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (*Licci II*) (alteration in original) (internal quotation marks and citations omitted) (quoting *United States v. Davidson*, 175 F. App'x 399, 401 n.2 (2d Cir. 2006) (summary order); *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 650 N.Y.S.2d 726, 727 (N.Y. App. Div. 1st Dep't 1996)), *certified question answered* 20 N.Y.3d 327 (N.Y. 2012) (*Licci III*).

[5] The Enforcement Release is attached as an exhibit to UBAF's motion to dismiss.  Doc. 22-1.

transactions involving the New York banking system, totaling more than $2 billion, in violation of U.S. sanctions against Syria. *Id.* ¶ 65. Plaintiffs allege "UBAF was a full and willing participant in the fraudulent schemes set up to flout U.S. sanctions against Syria." *Id.* ¶ 73. Indeed, Plaintiffs allege UBAF and its senior management "worked closely with Syria and its agencies and instrumentalities to execute and conceal" the violative transactions. *Id.* ¶ 74. Moreover, Plaintiffs allege UBAF "meaningfully benefited from the" scheme in the form of "substantial commissions, fees, revenues, and additional business [that it earned] by cooperating with Syria," as well as its own ability "to use Syrian funds while those funds were in UBAF's possession." *Id.* ¶ 75.

To effectuate its scheme to evade sanctions, Syria primarily used two methods: "the Internal Fund Transfer Scheme" and "the Letter of Credit Scheme." Of the 127 violations, 114 violations totaling nearly $1.3 billion were pursuant to the Internal Fund Transfer Scheme. *Id.* ¶ 66 (citing Enforcement Release). Of these 114 violations, 45 occurred when UBAF processed a U.S. dollar ("USD") transaction on its own books between two of its clients—one a sanctioned Syrian entity and one a non-sanctioned client. *Id.* ¶ 67. UBAF then processed one or more transfers for the non-sanctioned client for the same or similar amounts that cleared a U.S. bank, essentially using the non-sanctioned client as a middleman to access the U.S. bank. *Id.* For the remaining 69 internal transfers, UBAF conducted a foreign exchange transaction on its own books by which it debited a sanctioned Syrian customer's account with one currency and credited the same account in another currency, then conducted a U.S.-cleared foreign exchange transaction with a non-sanctioned third party for the same or similar amount so that the sanctioned customer was able to effectuate a U.S.-cleared foreign exchange effectively in the name of the non-sanctioned third party. *Id.* ¶ 68. In both types of internal transfers, Plaintiffs allege "UBAF effectively hid the true counterparty of these transactions [by] stripping references to sanctioned entities so that Syrian funds could enter and transmit through New York banks while avoiding U.S. scrutiny." *Id.* ¶ 69.

The remaining 13 violations, pursuant to the Letter of Credit Scheme, involved "back-to-back" letters of credit or trade finance transactions. *Id* ¶¶ 70–72. In the back-to-back letters of credit transactions, a sanctioned Syrian entity was the beneficiary of an export letter of credit or the applicant for an import letter of credit, none of which, on their face, involved USD clearing. *Id.* ¶ 71. But an intermediary non-sanctioned entity entered into or received one or more corresponding letters of credit in USD to purchase or sell the same goods. *Id.* In the trade finance transactions, UBAF either issued a USD-denominated letter of credit on behalf of a sanctioned party, or then provided a confirmed USD-denominated letter of credit issued by a sanctioned bank and paid on the letter of credit through a U.S. cleared transaction. *Id.* ¶ 72.

### C.  The Instant Action

On February 28, 2022, approximately 13 months after the Treasury's announcement of its settlement with UBAF, Plaintiffs filed the instant action against UBAF for fraudulent conveyance and turnover. Compl.

UBAF moved to dismiss on December 15, 2022. Doc. 20.[6] UBAF alleges that Plaintiffs' complaint should be denied on three independent bases: (1) Plaintiffs' actual and constructive fraudulent conveyance claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim; (2) Plaintiffs' turnover claims should be dismissed pursuant to Rule 12(b)(1) because the Court lacks subject matter jurisdiction over the turnover claims on the basis that the assets sought to be turned over are immune under the FSIA; and (3) Plaintiffs' complaint should be dismissed in its entirety pursuant to Rule 12(b)(2) because the Court lacks personal jurisdiction over UBAF. *See generally* Doc. 21 (Memorandum of Law in Support of Def.'s Motion to Dismiss Compl., "Mem.").

---

[6] UBAF first moved to dismiss on October 21, 2022 (Doc. 10), but the Court denied the motion without prejudice for its failure to comply with the Court's rules requiring a pre-motion conference (Doc. 13). UBAF properly requested a pre-motion conference on November 1, 2022. Doc. 16. At the December 1, 2022 conference, the Court granted UBAF leave to file the instant motion (Doc. 18), which it then filed on December 15 (Doc. 20).

## II.     LEGAL STANDARDS

### A.   Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction[7]

"Determining the existence of subject matter jurisdiction is a threshold inquiry

and a claim is properly dismissed for lack of subject matter jurisdiction under Rule

12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate

it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation

omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263

(2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question"

(quotation marks omitted)).  "A plaintiff asserting subject matter jurisdiction has the

burden of proving by a preponderance of the evidence that it exists." *Makarova v. United

States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).  While the Court must accept

as true all factual allegations in the complaint, *Morrison*, 547 F.3d at 170 (citation

omitted), the Court may not draw any jurisdictional inferences in favor of Plaintiffs,

*Fraser v. United States*, 490 F. Supp. 2d 302, 307 (E.D.N.Y. 2007) (citing *Shipping Fin.

Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).  "Jurisdiction must be shown

affirmatively, and that showing is not made by drawing from the pleadings inferences

favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)

(citing *Drakos*, 140 F.3d at 131).  Thus, in resolving a motion to dismiss for lack of

subject matter jurisdiction pursuant to Rule 12(b)(1), a district court may consider

evidence outside the pleadings.  *Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at

113).

### B.   Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Plaintiffs "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal

jurisdiction ha[ve] the burden of establishing that the court has jurisdiction over the

---

[7] Although UBAF styles its arguments as to the turnover claims as a Rule 12(b)(1) motion to dismiss for want of subject matter jurisdiction, UBAF does not argue that this court lacks federal question jurisdiction over Plaintiffs' TRIA claim and supplemental jurisdiction over the three state law claims.  It is thus undisputed that this Court has constitutional and statutory jurisdiction to decide the instant motion.

defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-cv-4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  Plaintiffs "must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, Plaintiffs must plead facts sufficient for a prima facie showing of jurisdiction.  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  The Court construes all of Plaintiffs' allegations as true and resolves all doubts in Plaintiffs' favor.  *Casville Invs., Ltd. v. Kates*, No. 12-cv-6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012)). "However, [Plaintiffs] may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14-cv-3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citation omitted).  The Court may rely on additional materials outside the pleading when ruling on 12(b)(2) motions.  *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91-cv-3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *Darby Trading Inc. v. Shell Intern. Trading and Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008) (citations omitted).

### C.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.    DISCUSSION

When the Court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether the complaint states a claim. *See Darby Trading*, 568 F. Supp. 2d at 335 (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir.1963)); *Yellow Page Sols. Inc. v. Bell Atl.*

*Yellow Pages Co.*, No. 00-cv-5663 (MM), 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) (citation omitted). Accordingly, the Court first addresses UBAF's arguments as to personal and subject matter jurisdiction before turning to UBAF's 12(b)(6) arguments as to the fraudulent conveyance claims.

### A. The Court Has Personal Jurisdiction Over UBAF

A federal court may lawfully exercise personal jurisdiction over a defendant only where personal jurisdiction comports both with constitutional due process and the appropriate state long-arm statute. *See Licci II*, 673 F.3d at 59–60. UBAF moves to dismiss for lack of personal jurisdiction on the basis that neither requirement is satisfied here.[8]

New York's long-arm statute, CPLR § 302(a)(1), provides that a court may obtain personal jurisdiction over a non-domiciliary like UBAF "who in person or through an agent . . . transacts any business within the state," so long as the cause of action "aris[es] from" that "transact[ion]." CPLR § 302(a)(1) does not reach as far as is constitutionally permissible. *Licci II*, 673 F.3d at 61 ("The state statutory and federal constitutional standards are . . . not co-extensive, as they are in many other states." (citations omitted)). Under the doctrine of constitutional avoidance, the Court will therefore first consider the statutory basis for personal jurisdiction before addressing whether jurisdiction comports with the constitutional limits of due process. *See id.* Ultimately, the Court concludes that personal jurisdiction is proper under both New York's long arm statute and due process.

#### 1. *The Licci Litigation*

Both parties treat the *Licci* decisions as dispositive as to both statutory and constitutional considerations, and the Court agrees. The *Licci* decisions concerned a defendant foreign bank, Lebanese Canadian Bank's ("LCB"), use of a correspondent bank account in New York to wire funds to a terrorist organization that used those funds

---

[8] It is undisputed that this Court lacks general personal jurisdiction over UBAF, and Plaintiffs must therefore rely on specific jurisdiction.

to allegedly perpetrate attacks that injured the plaintiffs.  The Southern District of New York granted LCB's motion to dismiss for lack of personal jurisdiction on the grounds that the mere maintenance of the account and use of the account to wire funds was insufficient to establish specific personal jurisdiction over the bank pursuant to New York's long-arm statute.  *Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 407 (S.D.N.Y. 2010) (*Licci I*).

On appeal, the Second Circuit conducted an exhaustive analysis of precedent addressing personal jurisdiction predicated on a foreign bank's maintenance of a correspondent account in New York before ultimately concluding that existing precedent was insufficient to predict how the New York Court of Appeals would resolve the question, and the question was best left to that court.  *Licci II*, 673 F.3d at 61–74. Accordingly, the Second Circuit certified two questions to the New York Court of Appeals:  (1) whether and under what circumstances, within the meaning of CPLR § 302(a)(1), a foreign bank's maintenance of a correspondent account in New York constitutes a "transact[ion]" of business in New York and (2) whether and under what circumstances, within the meaning of CPLR § 302(a)(1), claims such as plaintiffs' "aris[e] from" the foreign bank's transaction of business in New York.  *Id.* at 66, 74.

As to the first question, the New York Court of Appeals held that "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."  *Licci III*, 20 N.Y.3d at 339 (internal citation omitted).  Comparatively, the mere existence of a correspondent bank relationship between a foreign bank defendant and a New York financial institution, even if coupled with use of that correspondent account in an isolated transaction entirely at the direction of the defendant foreign bank's customer,

will not be sufficient to give rise to personal jurisdiction over the defendant foreign bank for claims arising from the transaction.  *Id.* at 337–38.

As to the second question, the Court of Appeals held that there must be an "articulable nexus" or "substantial relationship" between the business transaction and the claim asserted.  *Id.* at 339 (citations omitted).  As causation is not required, and "the inquiry under the statute is relatively permissive," these standards only require that the claims be "in some way arguably connected to the transaction" such that "the latter is not completely unmoored from the former."  *Id.* at 339–40 (citations omitted).

Consequently, the Court of Appeals held:

> While it may be that LCB could have routed the dollar transactions on behalf of Shahid [*i.e.*, the third party through which the designated terrorist organization funneled money] elsewhere, the fact that LCB used a New York account "dozens" of times indicates desirability and a lack of coincidence.  Presumably, using the [New York correspondent] account was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain Shahid as a customer and to support its allegedly terrorist activities and programs.

> In sum, repeated use of the correspondent account shows not only transaction of business, but an articulable nexus or substantial relationship between the transaction and the [plaintiffs' claims].  LCB did not route a transfer for a terrorist group once or twice by mistake.  Rather, plaintiffs allege that LCB deliberately used a New York account again and again to effect its support of Shahid and shared terrorist goals.  Not all elements of the causes of action pleaded are related to LCB's use of the correspondent account.  And the specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets.  Yet CPLR 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.

*Id.* at 340–41.

After the New York Court of Appeal's decision, the Second Circuit addressed whether exercising jurisdiction over LCB also comported with constitutional due process

and concluded that jurisdiction was constitutionally proper.  *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013) (*Licci IV*).  As a preliminary matter, the Second Circuit first observed that, even though New York's long-arm statute and constitutional due process are not coextensive such that personal jurisdiction could *theoretically* be permitted under CPLR § 302(a)(1) but prohibited under due process, the court "would expect such cases to be rare."  *Id.* at 170 ("It would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have purposefully availed itself of the privilege of doing business in the forum and [to have been able to] foresee being haled into court there, or [that] the assertion of specific jurisdiction would somehow otherwise offend traditional notions of fair play and substantial justice." (internal citations and quotation marks omitted)).  The Second Circuit further noted that it could identify no such cases in the circuit.  *Id.*

Applying due process principles to the *Licci* dispute, the Second Circuit held that personal jurisdiction was proper.  LCB's "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress" established minimum contacts under the purposeful availment test.  *Id.* at 171 (citation omitted).  And the Second Circuit explicitly rejected LCB's attempts to disclaim personal jurisdiction based on *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659 (2d Cir. 2013), because that case concerned only the effects test, which was inapposite where the conduct forming the basis for the controversy occurred, at least in part, in-state—just as in *Licci IV* through the use of the New York correspondent account.  *Id.* at 172–73.

Addressing the reasonableness inquiry, the Second Circuit rejected LCB's argument that personal jurisdiction was unreasonable because the relevant documents and witnesses, as well as the situs of the injuries and deaths for which compensation is

sought, were all located abroad.  *Id.* at 173–74.  The court highlighted that "the conveniences of modern communication and transportation ease any burden the defense of this case in New York might impose on LCB," and it emphasized that the United States' and New York's "interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends" outweighed the inconveniences to which defendant pointed.  *Id.* at 174 (internal quotation marks and citation omitted).  Accordingly, it concluded that personal jurisdiction did not offend principles of fair play and was statutorily and constitutionally lawful.  *Id.*

### 2.  *Personal Jurisdiction is Proper Under New York's Long Arm Statute*

Plaintiffs allege personal jurisdiction is proper under CPLR § 302(a)(1).  Opp. at 14.  Specifically, Plaintiffs allege that UBAF's "purposeful" use of correspondent bank accounts in New York constitutes "transact[ing] business" in New York and is sufficient contact, standing alone, for purposes of personal jurisdiction over UBAF.  *Id.* at 15 (citing *Licci III*, 20 N.Y.3d at 338).  Plaintiffs also argue UBAF's use of the correspondent accounts has the requisite "articulable nexus or substantial relationship between the business transaction and the claim asserted."  *Id.* (citing *Licci III*, 20 N.Y.3d at 339).

UBAF, however, argues that its use of New York correspondent accounts was not purposeful because only "a foreign bank's repeated use of a correspondent account in New York *on behalf of a client* . . . show[s] purposeful availment" under *Licci III*, but Plaintiffs here fail to allege it repeatedly used the accounts "'on behalf of' any Syrian Entity," only the *non-sanctioned third parties*.  Mem. at 30 (citing *Licci III*, 20 N.Y.3d at 338–39).  Moreover, UBAF argues even if the transfers for the non-sanctioned third parties did rise to the level of "purposeful[ness]," Plaintiffs' claims do not arise from the transfers because "no element of either claim even arises from UBAF's use of its correspondent account."  *Id.* at 31 (citing *Licci III*, 20 N.Y.3d at 339–41).  Rather, UBAF argues that, if the transfers at issue were voidable, they were voidable when completed in

France, making UBAF's use of its correspondent accounts to clear transactions in NY "merely coincidental" to the fraudulent conveyance claims and entirely unrelated to the turnover claims that target property held abroad.  *Id.* (citing *Licci III*, 20 N.Y.3d at 340).

Applying the *Licci* line of cases, courts in this district have held that, when a bank designates the use of New York correspondent accounts to effectuate transactions, personal jurisdiction is lawful over the bank for causes of action arising out of the transactions.  *See, e.g., Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 U.S. Dist. LEXIS 10902, at *16–25 (S.D.N.Y. Jan. 21, 2020) (R&R), *adopted by* 2020 U.S. Dist. LEXIS 40430 (S.D.N.Y., Mar. 9, 2020); *Official Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahr Islamic Bank*, 549 B.R. 56, 68-71 (S.D.N.Y. 2016).  Indeed, the Second Circuit has recently held that, when a bank uses another bank's New York correspondent account to effectuate jurisdiction (so-called "nested" correspondent banking), personal jurisdiction is still lawful over the former originating bank for causes of action arising out of the transactions.  *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 642–43 (2d Cir. 2023).

The factual allegations underlying Plaintiffs' claims here are fundamentally the same as in *Licci*:  plaintiffs in both are victims of attacks perpetrated by terrorist organizations funded by related third party entities that used a foreign bank's New York correspondent accounts to transmit money to those terrorist organizations.  *Compare* Compl. ¶¶ 1–12, 73–79, *with Licci III*, 20 N.Y.3d at 340–41.  Moreover, Plaintiffs' allegations as to UBAF's use of New York correspondent accounts are in fact substantially *more* "purposeful" than those which *Licci III* held sufficient to establish personal jurisdiction.  As compared to dozens of transactions through New York in *Licci III* and only seven in *Averbach*, UBAF acknowledges that it conducted *127 transactions* through its New York correspondent accounts that violated U.S. sanctions laws. *Compare Licci III*, 20 N.Y.3d at 332, *and Averbach*, 2020 U.S. Dist. LEXIS 10902, at *19, *with* Mem. at 13.  Though the sheer frequency of UBAF's use of New York

correspondent accounts is likely sufficient on its own to constitute "purposefulness," Plaintiffs further allege that UBAF intentionally and "knowingly execute[d] . . . transfers through its U.S. correspondent accounts in New York for the benefit of Syria in evading U.S. sanctions" (Compl. ¶ 9)—an even greater level of involvement than mere passive transfer, *see Averbach*, 2020 U.S. Dist. LEXIS 10902, at *20–23. Given the factual similarities between the claims here and those in *Licci III*, this Court holds that jurisdiction is proper under CPLR § 302(a)(1) because "repeated use of the correspondent account shows not only transaction of business, but an articulable nexus or substantial relationship between the transaction and [Plaintiffs' claims]." *Licci III*, 20 N.Y.3d at 340.

The primary meaningful difference between the *Licci* cases and the instant dispute is that the *Licci* plaintiffs, unlike Plaintiffs here, did not bring fraudulent conveyance or turnover claims. As UBAF correctly argues, personal jurisdiction must be established with respect to *each* claim asserted, and Plaintiffs therefore cannot "shoehorn" jurisdiction over one claim into jurisdiction over the other. Doc. 24 ("Reply") at 15 (citing *Charles Schwab Corp.*, 883 F.3d at 83). But the inquiry as to whether personal jurisdiction exists still turns on the underlying conduct—*i.e.*, whether the defendant "transact[ed] any business within the state" and whether the cause of action "aris[es] from" that "transact[ion]." *See* CPLR § 302(a)(1). All of Plaintiffs' claims arise from UBAF's use of New York correspondent accounts to transfer, in a manner meant to evade Syrian sanctions, funds allegedly used to support terrorist attacks that injured Plaintiffs. Compl. ¶¶ 1–12, 73–112. That is the same conduct found to be sufficient to support personal jurisdiction in *Licci III*. *Compare id.*, *with Licci III*, 20 N.Y.3d at 340–41. Accordingly, following *Licci III*, personal jurisdiction is proper over UBAF pursuant to CPLR § 302(a)(1).

### 3. *Personal Jurisdiction Comports with Due Process*

For personal jurisdiction to be lawful, the Court must find that, in addition to comporting with New York's long-arm statute, personal jurisdiction is also constitutional.

*Licci IV*, 732 F.3d at 169 (citing *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007)). Personal jurisdiction satisfies the requirements of due process where (1) the defendant has minimum contacts with the forum, and (2) the exercise of personal jurisdiction is reasonable in that it comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts may be established either based on the defendant's activity in New York (the "purposeful availment" test) or the effects in New York of its out-of-state activities (the "effects" test). *Licci IV*, 732 F.3d at 173. Once minimum contacts are established under either test, the defendant bears the burden to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)). The reasonableness analysis considers 5 factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* (citing *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987); *Burger King*, 471 U.S. at 476–77; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980); *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 83 (2d Cir. 1993)).

Plaintiffs allege that minimum contacts are established under either the purposeful availment or effects tests. Opp. at 17. Comparatively, UBAF construes the minimum contact inquiry solely as a question of whether "the defendant took 'intentional, and allegedly tortious actions . . . expressly aimed' at the forum"—*i.e.*, the effects test. Mem. at 32 (alteration in original) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 674). And, under the effects test, UBAF argues it could not have been expected to be haled into court by these Plaintiffs, and personal jurisdiction is therefore improper. *Id.*

At the second stage of the due process inquiry, UBAF argues personal jurisdiction is unreasonable because litigating Plaintiffs' claims in New York would be burdensome on UBAF, Plaintiffs' claims may be governed by French or Syrian law or present a conflict of laws issue, UBAF runs a risk of multiple liability, and New York has no special interest in adjudicating the dispute.  Mem. at 32–33.  Plaintiffs respond that UBAF failed to satisfy its burden as to unreasonableness, nor can it satisfy its burden because modern communication and transportation ease any burden UBAF would face from New York litigation; Plaintiffs and New York have interests in holding UBAF accountable and ensuring the New York banking system is not used for nefarious ends; and the risk of litigation in multiple jurisdictions is no greater here for UBAF than for any other bank conducting business in multiple countries.  Opp. at 18–19.

As with the statutory analysis of personal jurisdiction, the relevant underlying factual allegations in *Licci* and the instant dispute are fundamentally the same.  *Compare* Compl. ¶¶ 1–12, 73–79, *with Licci IV*, 732 F.3d at 165–66.  And because, as before, the critical inquiry as to the lawfulness of personal jurisdiction turns on the underlying conduct, this Court again follows *Licci*:  UBAF's "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress" establishes minimum contacts under the purposeful availment test.  *See Licci IV*, 732 F.3d at 171 (citation omitted).  And UBAF's citation to *In re Terrorist Attacks on Sept. 11, 2001* (Mem. at 32) is unavailing:  the effects test is inapposite because UBAF's of the correspondent account occurred in-state.  *See Licci IV*, 732 F.3d at 172–73.

Finally, UBAF's arguments concerning reasonableness differ only slightly from the *Licci* defendant's.  Thus, as in *Licci IV*, given the ease of modern transportation and communication, and New York's significant interests in monitoring and regulating banking activity, UBAF's arguments regarding the burden of litigation in New York are insufficient to render the exercise of personal jurisdiction unreasonable.  *Id.* at 174.

UBAF's further concerns as to conflicts of laws and risks of multiple liability do not change the result. *See Anglo Am. Ins. Grp., P.L.C. v. CalFed Inc.*, 916 F. Supp. 1324, 1337 (S.D.N.Y. 1996). Accordingly, UBAF has not met its burden to show that personal jurisdiction would be unreasonable. This case will not be the "rare" and "unusual" case to become the first instance in which personal jurisdiction is unconstitutional despite being statutorily proper under CPLR § 302(a)(1). *See Licci IV*, 732 F.3d at 170.

Consequently, this Court's exercise of personal jurisdiction over UBAF is both statutorily and constitutionally lawful.

### B.  The Court Has Subject Matter Jurisdiction Over Plaintiffs' Turnover Claims

Plaintiffs' third and fourth counts assert claims for turnover pursuant to CPLR § 5225 and the TRIA, respectively. Compl. ¶¶ 103–12. Under both claims, Plaintiffs ask the Court to enforce Plaintiffs' judgments against Syria by issuing an order that directs UBAF to pay to Plaintiffs all rights, title, and interest that Syria has in any assets that remain in UBAF's possession, up to the amount of Plaintiffs' judgments. *Id.* ¶¶ 105, 112. UBAF moves to dismiss the claims, as it argues that any Syrian assets are held only at UBAF's branches outside the United States and are therefore immune from attachment and execution under either CPLR § 5225 or the TRIA. Mem. at 25–29. UBAF does not otherwise challenge Plaintiffs' turnover claims (*e.g.*, for failure to state a claim), nor does it argue that the Syrian assets would be immune from execution under the FSIA even if located in the United States. Plaintiffs respond that "[i]t is of no moment" that the Syrian assets are located abroad because the Court can order UBAF to bring assets into New York so long as the Court has personal jurisdiction over UBAF. Doc. 23 ("Opp.") at 31. Plaintiffs do not dispute that UBAF possesses no Syrian assets in the United States, nor do Plaintiffs dispute that any Syrian assets are immune from turnover so long as they are located abroad. *See. id*. at 39–32. Consequently, the sole question before the Court is

whether it can direct UBAF to transfer the Syrian assets into the U.S. where they could be subject to turnover.  The Court holds that it can so direct UBAF.

Both parties agree that the dispositive case on this question is *Peterson v. Islamic Republic of Iran*.  *See* Mem. at 25–29; Opp. at 29–32.  In that case, the Second Circuit reviewed the district court's dismissal of turnover claims by judgment creditors of the Islamic Republic of Iran ("Iran") who sought to execute on Iranian bond proceeds located abroad.  876 F.3d 63, 76 (2d Cir. 2017) (*Peterson II*), *vacated on other grounds sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020).  The district court found that the extraterritoriality of the Iranian assets was "fatal to the plaintiffs' turnover claims" because federal courts lack jurisdiction to order the attachment of a foreign sovereign's property abroad.  *Id.* at 70 (citing *Peterson v. Islamic Republic of Iran*, No. 13-cv-9195 (KBF), 2015 U.S. Dist. LEXIS 20640, at *31 (S.D.N.Y. Feb. 19, 2015) (*Peterson I*)).

The Second Circuit vacated the district court's opinion and remanded.  *Id.* at 96. Specifically, the Second Circuit held that the FSIA does not provide the procedure for attachment and execution proceedings, and courts should instead apply Federal Rule of Civil Procedure 69(a), under which a district court may enforce a judgment by attaching property in accordance with the law of the state in which the district court sits.  *Id.* at 89– 90.  New York law provides that, where a person has possession or custody of assets in which a judgment creditor has an interest, if the judgment debtor is entitled to possession of the property, then the court may require the person in possession of the assets to turnover to the judgment creditor that which is sufficient to satisfy the judgment.  *Id.* at 90–91 (citing CPLR § 5225(b); *Koehler v. Bank of Berm. Ltd.*, 12 N.Y.3d 533, 541 (N.Y. 2009)).  Moreover, the FSIA "appears to be no impediment to an order issued pursuant to *Koehler* directing [defendant bank]—should the court have personal jurisdiction over it— to bring the [sovereign]-owned asset held [abroad] to New York State" because the FSIA affects only *in personam* jurisdiction over a foreign *sovereign*, but an order pursuant to *Koehler* would be directed at a *non-sovereign* bank that does not enjoy jurisdictional

22

immunity under the FSIA. *Id.* at 91–92 (citing *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141–43 (2014)). Consequently, the Second Circuit held that "*NML Capital* and *Koehler*, when combined, do authorize a court siting in New York with personal jurisdiction over a non-sovereign third party to recall to New York extraterritorial assets owned by a foreign sovereign." *Id.* at 92. On remand, the Second Circuit directed the district court to first determine whether it had personal jurisdiction over the defendant bank; if it did, the court should determine whether state or federal law, international comity, or any other reason barred an exercise of *in personam* jurisdiction to recall to New York assets the defendant bank held abroad for Iran. *Id.* at 94. Because the asset, once recalled to New York, would be an asset of a foreign state in the United States, it would be immune from execution under 28 U.S.C. § 1609 unless an execution-immunity exception (*e.g.*, 28 U.S.C. § 1610, TRIA § 201(a)) applied, and the district court should conduct a traditional FSIA analysis. *Id.*

*Peterson II* was appealed, and the Supreme Court in a summary order granted certiorari, vacated the judgment, and remanded the case to the Second Circuit "for further consideration in light of the National Defense Authorization Act for Fiscal Year 2020" ("NDAA"), Pub. L. 116–92. *Bank Markazi*, 140 S. Ct. at 813. The NDAA amended § 502 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (22 U.S.C § 8872) to "expan[d] availability of financial assets of Iran to victims of terrorism." NDAA § 1226. Specifically, the NDAA provided that the financial assets at issue in *Peterson v. Islamic Republic of Iran*, No. 10-cv-4518 (BSJ) (GWG) (S.D.N.Y.) and *Peterson v. Islamic Republic of Iran*, No. 13-cv-9195 (LAP) (S.D.N.Y.) "shall be subject to execution or attachment in aid of execution, or to an order directing that the asset be brought to the State in which the court is located and subsequently to execution or attachment in aid of execution, in order to satisfy any judgment to the extent of any compensatory damages awarded against Iran for damages for personal injury or death

caused by [specified acts] without regard to concerns relating to international comity." 22 U.S.C § 8872(a)(1), (b) (as modified by the NDAA).

On remand, the Second Circuit reinstated its judgment that the district court prematurely dismissed plaintiffs' turnover claims for lack of subject matter jurisdiction and remanded the case for the district court to reconsider that question. *Peterson v. Islamic Republic of Iran*, 963 F.3d 192, 196 (2d Cir. 2020) (*Peterson III*).  The Second Circuit declined, however, to reinstate its analysis under *Koehler* because it did not need to reach the question in light of the NDAA. *Id.*  Whereas UBAF urges that this Court "should not place any stock in the vacated *Peterson II* decision," Mem. at 28, Plaintiffs contend that "[w]hile *Peterson II* is no longer controlling, its reasoning remains sound," and this Court should therefore follow *Peterson II* and order UBAF to bring to New York those Syrian assets in its possession necessary to satisfy Plaintiffs' judgments, Opp. at 31.

The Court agrees with Plaintiffs.  Although *Peterson III* did not reinstate the Second Circuit's *Peterson II* holding as to *Koehler*, the Supreme Court did not repudiate *Peterson II*'s holding or reasoning as to *Koehler*.  Thus—for the same reasons set forth in *Peterson II*—because this Court has personal jurisdiction over UBAF (as held above), it therefore has jurisdiction to order it to recall extraterritorial assets owned by Syria to New York, which in turn means the Court has jurisdiction over Plaintiffs' turnover claims. *See Peterson II*, 876 F.3d at 92.

Because UBAF raises no arguments as to the second step set out in *Peterson II*, this Court need not perform a traditional FSIA analysis at this time.  And, as UBAF argues no other basis on which to dismiss Plaintiffs' turnover claims, UBAF's motion to dismiss is denied as to the turnover claims.

### C.  Plaintiffs' Fraudulent Conveyance Claims Are Dismissed

UBAF moves to dismiss Plaintiffs' actual and constructive fraudulent conveyance claims on three independent bases:  (1) that UBAF is not a transferee or beneficiary (the only defendants against whom fraudulent conveyance claims may be brought); (2) that

the conveyances were not actually or constructively fraudulent; and (3) that the claims are time-barred. Mem. at 15–25. The Court addresses first the argument as to the applicable statute of limitations, holding that the actual fraudulent conveyance claim is untimely and must be dismissed, but the constructive fraudulent conveyance claim is timely. Second, Plaintiffs' constructive fraudulent conveyance claims must be dismissed because UBAF is not a transferee or beneficiary. Because both fraudulent conveyance claims are therefore dismissed and deciding UBAF's final remaining argument involves issues of new law, the Court does not reach UBAF's third argument.

   1.   *Under the Applicable Statutes of Limitations, the Actual Fraudulent Conveyance Claim is Untimely, but the Constructive Fraudulent Conveyance Claim is Timely*

   Plaintiffs bring claims under New York Debtor and Creditor Law § 273-a for constructive fraudulent conveyance and under § 276 for actual fraudulent conveyance on the basis of UBAF's 2011 to 2013 transfers, which Plaintiffs discovered through the January 4, 2021 Enforcement Release. Compl. ¶¶ 80–102. Sections 273-a and 276, part of the Uniform Fraudulent Conveyance Act ("UFCA"), were both repealed when New York enacted the Uniform Voidable Transactions Act ("UVTA," 2019 N.Y. Laws 580), which amended the UFCA and went into effect April 4, 2020. *See generally* UVTA. Under the UFCA, plaintiffs had to bring actual fraudulent conveyance claims within six years of the fraud or conveyance, or two years after discovery in the case of actual fraudulent conveyance claims. *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 530 (N.Y. App. Div. 1st Dep't 1999). The UVTA shortened the window to four years from the date of the transfer with a one-year discovery rule. UVTA § 2 (amending N.Y. Debt. & Cred. Law, § 278). The UVTA is expressly not retroactive and applies only to transfers made or obligations incurred on or after its effective date of April 4, 2020. UVTA § 7.

   UBAF argues that Plaintiffs' actual fraudulent conveyance claim originally accrued at the time of transfers and then, pursuant to the discovery rule, accrued when discovered on January 4, 2021, which makes it subject to the UVTA's one-year discovery

rule and therefore untimely as filed on February 28, 2022.  Mem. at 23–24.  And it argues that the constructive fraudulent conveyance claim is likewise untimely because it accrued when the transfers occurred, and—as neither party disputes that the actual fraudulent conveyance claim is governed by the UFCA's six-year statute of limitations—Plaintiffs did not file until nearly a decade later.  *Id.* at 24–25.

Plaintiffs respond that the actual fraudulent conveyance claim accrued on the dates of the transfers and did not "re-accrue" when discovered, and—as the UVTA was expressly not retroactive—their claims are therefore governed by the UFCA's two-year discovery rule, under which the claim is timely.  Opp. at 20–21.  Further, Plaintiffs argue the constructive fraudulent conveyance claim did not accrue until the entry of judgment, and, as Plaintiffs filed within six years of entry, the claim is timely.  *Id.* at 21–23.

The Court finds that, under the applicable discovery rules, claims do not accrue until discovered, which means that Plaintiff's actual fraudulent conveyance claim is governed by the UVTA's one-year discovery rule period (not the UFCA's two-year period) and is therefore untimely.  But Plaintiff's constructive fraudulent conveyance claim did not accrue until entry of judgment and is therefore timely.

> ### a.  *Plaintiffs' Actual Fraudulent Conveyance Claim Accrued When Discovered in 2021 and are Therefore Subject to the UVTA, Pursuant to Which It Is Untimely*

The UVTA's non-retroactivity provision states that the UVTA "shall not apply to a transfer made or obligation incurred before such effective date [of April 4, 2020], nor shall it apply to a right of action that has accrued before such effective date."  UVTA § 7.  The UVTA does not define when a right of action accrues.  UBAF argues that, in order to give meaning to both clauses of the provision as non-superfluous, a right of action (the second clause) cannot accrue solely at the time of transfer or obligation (the first clause) and must therefore refer to the discovery rule.  Mem. at 23, n. 11.  Accordingly, UBAF argues the transfers took place when the UFCA six-year statute of limitations governed, but the claim then re-accrued with a new filing window when discovered January 4, 2021,

*after* the UVTA effective date, and were therefore governed by the one-year discovery rule.  *Id.*  Comparatively, Plaintiffs argue that the claim did not re-accrue when discovered; rather, the discovery rule effectively extends the underlying statute of limitations instead of creating a new limitations period, so the UFCA indisputably applies to the claim based on the date of the transfers, and the Court need not re-analyze whether the UVTA or UFCA apply based on the date of discovery.  Opp. at 21–23.

Although, no court appears to have decided when a claim accrues specifically for purposes of the UVTA's discovery rule, federal courts generally apply discovery rules to mean that, regardless of the underlying cause of action, a claim accrues when a plaintiff discovers (or reasonably should have discovered) he has been injured.  *See, e.g., Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (ERISA claims); *Dos Santos v. Assurant, Inc.*, No. 21-cv-6368 (PAE), 2022 U.S. Dist. LEXIS 158484, at *19 (S.D.N.Y. Sep. 1, 2022) (copyright); *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 613–15 (S.D.N.Y. 2021) (tort claims) (citing, *inter alia, Rotella v. Wood*, 528 U.S. 549, 555–56 (2000) (RICO cases)).  New York courts do the same.  *See, e.g., Marasa v. Andrews*, 69 A.D.3d 584, 584 (N.Y. App. Div. 2nd Dep't 2010) (fraud claims); *Mevis v. Eli Lilly & Co. (In re N.Y. Cty. DES Litig.)*, 220 A.D.2d 34, 36 (N.Y. App. Div. 1st Dep't 1996) (tort claims).

In other words, the discovery rule neither tolls the statute of limitations so that it runs continuously from the date of injury through the end of the discovery period (as Plaintiffs argue), nor does it start a second, "re-accrued" statute of limitations at the time of discovery that is new and separate from that which ran from the time of injury (as UBAF argues).  Rather, the discovery rule delays the date that a cause of action accrues until discovery at which point the statute of limitations runs *for the first time*.  *Bryant v. Comm'r of Soc. Sec.*, No. 14-cv-5764 (LTS), 2015 U.S. Dist. LEXIS 151143, at *38-39 n.17 (S.D.N.Y. Aug. 17, 2015) ("[T]he diligence-discovery rule delays the date of accrual . . . ." (citing *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir.

2014)); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 (3d Cir. 1994) ("[T]he accrual date is not the date on which the wrong that injures the plaintiff occurs, but the date on which the plaintiff discovers that he or she has been injured." (citation omitted)); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) ("The rule that postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured is the 'discovery rule' . . . ."));  *see also Nat'l Ramah Comm'n, Inc.*, No. 16-cv-6869 (NSR), 2018 U.S. Dist. LEXIS 153317, at *13 (S.D.N.Y. Sep. 7, 2018) (holding that, under a discovery rule, "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause" (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)).

Here, it is undisputed that Plaintiffs first learned about the allegedly fraudulent conveyances when the January 4, 2021 Enforcement Release was issued.  Mem at 24; Opp at 22.  As January 4, 2021 is after the UVTA's April 4, 2020 effective date, the UVTA—and its one-year discovery rule period—governs.  *See* UVTA § 7.  Plaintiffs did not file the complaint until February 28, 2022.  Doc. 1.  Accordingly, Plaintiffs' actual fraudulent conveyance claim is untimely.  UBAF's motion to dismiss the claim is granted.

> b.  *The Constructive Fraudulent Conveyance Claim Accrued Only at the Entry of Judgment and is Therefore Subject to the UFCA, Pursuant to Which it is Timely*

Plaintiffs' constructive fraudulent conveyance claim undisputedly does not benefit from a discovery rule.  Accordingly, the claim is timely only if it accrued on the date of entry of judgment in Plaintiffs' Underlying Actions (entered in *Thuneibat* on March 1, 2016; entered in *Foley* on April 13, 2017; and entered in *Roth* on September 28, 2018.  *See* Opp. at 20 (quoting *Commissioners of State Ins. Fund v. P.S.G. Const. Co., Inc.*, 91 A.D.3d 643, 644 (N.Y. App. Div. 2d Dep't 2012) ("[T]he six-year limitations period for a cause of action pursuant to Debtor and Creditor Law § 273-a . . . begins to run on the date

of entry of the judgment.")).   UBAF does not dispute that the constructive fraudulent conveyance claim is governed by the UFCA and its six-year statute of limitations, only that the six-year limitation period began to run at the date of the transfers rather than at the entry of judgment.   Mem. at 24–25 (citing *Wall St. Assocs.*, 257 A.D.2d at 530; *Citicorp Tr. Bank, FSB v. Makkas*, 67 A.D.3d 950, 952 (N.Y. App. Div. 2d Dep't 2009), *abrogated by Coyle v. Lefkowitz*, 89 A.D.3d 1054 (N.Y. App. Div. 2d Dep't 2011); *Martinez v. Chase Bank, N.A.*, 178 F. Supp. 3d 184, 188 (S.D.N.Y. 2016)).   UBAF further argues, without citation that, "it makes no sense" that, if Plaintiffs have no timely claim for actual fraud, their constructive fraudulent conveyance claim would be timely.   Reply at 13.

UBAF's authorities are unavailing.   *Wall Street Assocs.* concerns a claim brought under Debtor & Creditor Law § 273, not § 273-a, like Plaintiffs' claims here.   257 A.D.2d at 528.   *CitiCorp Tr. Bank, FSB*, 67 A.D.3d at 952, was abrogated—as UBAF even recognizes in its citation—by *Coyle*, 89 A.D.3d at 1056, which provides that the limitations period "begins to run on the date of entry of the judgment."   And the *Martinez* court did not need to evaluate the timeliness of the fraudulent conveyance claim because the plaintiff "expressly concede[d]" that all of her state law claims were time-barred.   178 F. Supp. 3d at 188.   Comparatively, ample authority supports Plaintiffs' position that the six-year limitations period for their constructive fraudulent conveyance claims only began when judgments were entered in Plaintiffs' Underlying Actions.   *See, e.g., Matter of Setters v. AI Props. & Devs. (USA) Corp.*, 139 A.D.3d 492, 493 (N.Y. App. Div. 1st Dep't 2016); *Commissioners of State Ins. Fund*, 91 A.D.3d at 644; *State Farm Mut. Auto. Ins. Co. v. Grafman*, No. 04-cv-2609 (NG) (SMG), 2015 U.S. Dist. LEXIS 6949, at *17 (E.D.N.Y. Jan. 21, 2015); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 295 F. Supp. 2d 366, 380 (S.D.N.Y. 2003).   And, contrary to UBAF's argument on reply—given that § 273-a explicitly applies to conveyances made without fair consideration while a defendant faces an action for money damages where, "*after*

*final judgment for the plaintiff* [in that action], the defendant fails to satisfy the judgment"—it *does* "make sense" for the limitations period to only run once judgment is entered.[9]  Accordingly, Plaintiffs' constructive fraudulent conveyance claims are not time-barred.

### 2.   UBAF was Not a Transferee or Beneficiary

Actual and constructive fraudulent conveyance claims may "only proceed against parties who participate in the fraudulent transfer of a debtor's property and [are] transferees and beneficiaries of the challenged conveyances," as both parties agree. Mem. at 16; Opp. at 23.  UBAF, however, disputes that it was a transferee or beneficiary, arguing that its actions were less egregious than those of the defendant banks in *Villoldo v. BNP Paribas S.A.*, Nos. 14-cv-9930 (AKH), 15-cv-268 (AKH), 15-cv-496 (AKH), 2015 WL 13145807 (S.D.N.Y. July 21, 2015), *aff'd* 648 F. App'x 53 (2d Cir. 2016), which were not found to be a sufficient basis for a fraudulent conveyance claim.  Mem. at 16.  Plaintiffs respond that UBAF's actions go beyond those of the *Villoldo* defendants, and the appropriate comparable case is, not *Villoldo*, but *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993).  Opp. at 26.

In *Villoldo*, judgment creditors against the Republic of Cuba ("Cuba") brought fraudulent conveyance claims against multiple banks for masterminding a scheme by which Cuba moved billions of dollars though New York banks in violation of sanctions laws in exchange for "substantial fees and commissions."  2015 WL 13145807, at *2–3. Plaintiff judgment creditors alleged the scheme prevented them from satisfying their default judgments pursuant to the TRIA by executing or attaching on the Cuban funds, which the banks should have blocked under U.S. sanctions laws against Cuba.  *Id.* at 1–2. The defendant banks had all already pled guilty to conspiring to violate, and violating, U.S. banking laws for their actions with respect to the Cuban fund transfers.  *Id.*  The

---

[9] Comparatively, § 276, which governs actual fraudulent conveyances, applies "as to both present and future creditors" and makes no reference to final judgments.

court found that the "[p]laintiffs' conclusory statements that the [d]efendants 'were beneficiaries' of the challenged conveyances as a result of their 'charging and collecting substantial fees and commissions' [did] not state a claim for which relief can be granted" because fraudulent conveyance claims can be brought only against transferees or beneficiaries, and "[a]iding and abetting a challenged conveyance, even in return for fees, does not make a party liable for fraudulent conveyance." *Id.* at *3 (citation omitted).

Plaintiffs' basis for treating UBAF as a transferee or beneficiary is fundamentally the same as the *Villoldo* plaintiffs:' the commissions and fees earned by carrying out the transactions. *Compare Villoldo*, No. 14-cv-9930 (AKH), Doc. 1, ¶ 50 ("BNPP and BNP USA directly benefited from its involvement and receipt of Cuban funds by charging and collecting substantial fees and commissions from the Cuban agencies and instrumentalities in exchange for the transfer services that BNPP and BNP USA provided."), *with* Compl. ¶ 75 ("Among other things, UBAF received substantial commissions, fees, revenues, and additional business by cooperating with Syria and permitting Syria's funds to unlawfully flow from Syria to UBAF accounts in New York, in violation of U.S. law.  UBAF further benefited through its ability to use Syrian funds while those funds were in UBAF's possession.").  And those commissions and fees are, as in *Villoldo*, insufficient to state a claim for fraudulent conveyance.  *See* 2015 WL 13145807, at *3.

Plaintiffs' comparison to *Stochastic*, on the other hand, is unavailing.  Plaintiffs allege that *Stochastic* stands for the proposition that the mere use of "some" of the fraudulently transferred assets to pay the defendant "lawyer-mastermind['s]" legal fees in that case was sufficient to make him a beneficiary.  Opp. at 26 (citing 995 F.2d at 1172).  But in *Stochastic*, the judgment debtors arranged for their lawyer (the "mastermind" defendant) to "take control of essentially all of their assets" and appeared to have granted the lawyer seemingly-unfettered discretion to pay some of the debts, as well as the debtors' personal and business expenses—and the lawyer used the control he was given

to cheat his debtor clients out of their assets for his own benefit.  995 F.2d at 1162, 1164. Here, Plaintiffs have not alleged that UBAF was given the same degree of control and discretion over the ultimate disposition of Syria's funds.

As UBAF's actions are thus essentially similar to those of the defendant banks in *Villoldo* and do not rise to the level of control as those of the *Stochastic* lawyer defendant, Plaintiffs have not pled a sufficient basis to find that UBAF acted as a transferee or beneficiary of the allegedly fraudulent conveyances.  Accordingly, Plaintiffs' surviving constructive fraudulent conveyance claim is dismissed; and, even had the actual fraudulent conveyance been timely, it still would have been subject to dismissal on the same basis that UBAF was not a transferee or beneficiary. [10]

### 3.  *The Court Need Not Reach UBAF's Arguments as to the Fraudulence of the Conveyances*

UBAF further argues that Plaintiffs' fraudulent conveyance claims must be dismissed because the conveyances at issue were not fraudulent because they (1) were not made by any defendants in Plaintiffs' Underlying Actions and (2) were not made for the purposes of defrauding Plaintiffs—both of which are required elements for fraudulent conveyance claims.  Mem. at 20–23.  Plaintiffs argue that both requirements have been adequately pled.  Opp. at 27–29.

Both parties, however, exclusively support their arguments based on the law as it applied before April 4, 2020, under the UFCA—not the now-governing UVTA, which this Court held applies to Plaintiffs' actual fraudulent conveyance claim.  *See, e.g.*, Mem. at 20–23; Opp. at 27–29.  Further, no New York court has yet decided whether the two elements UBAF identifies remain identical requirements under the UVTA.  This Court declines to be the first, particularly since Plaintiffs' actual and constructive fraudulent

---

[10] Although the parties cited cases applying the UFCA to this question, and the Court's analysis above also applies the UFCA, at least one New York court appears to have held the "transferee or beneficiary" requirement remains the same under the UVTA as well.  *See Bd. of Mgrs. of the 165 E. 62nd St. Condo. v. Churchill E 62nd LLC*, 2023 N.Y. Misc. LEXIS 2690, *21–22 (N.Y. Sup. Ct. May 25, 2023).

conveyance claims are already subject to dismissal on the basis that UBAF is not a transferee or beneficiary and that the actual fraudulent conveyance claim is untimely, as held above.  Accordingly, the Court need not reach UBAF's arguments as to the fraudulence of the conveyances to dismiss Plaintiffs' fraudulent conveyance claims.

## IV.    CONCLUSION

For the foregoing reasons, UBAF's motion to dismiss is GRANTED in part and DENIED in part.  UBAF's request for oral argument is also DENIED as moot.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 21 and 25.

The parties are directed to appear for a telephonic conference on August 10, 2023 at 10:30 AM.  The parties are directed to call (877) 411-9748 at that time and enter access code 3029857#.

It is SO ORDERED.

Dated:    July 20, 2023
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.