UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VIRGINIA FOLEY, *et al.*,

                    Plaintiffs,

        – *against* –

UNION DE BANQUES ARABES ET
FRANÇAISES,

                    Defendant.

**OPINION & ORDER**

22-cv-01682 (ER)

RAMOS, D.J.:

Plaintiffs—thirty victims and family members of victims of acts of terrorism sponsored by the Syrian Arab Republic ("Syria"), all of whom have obtained final judgments against Syria for damages—bring this suit against Union de Banques Arabes et Françaises ("UBAF") for allegedly working with Syria to evade U.S. sanctions and thereby prevent Plaintiffs from executing on Syrian assets to satisfy their judgments. Doc. 1.  Plaintiffs brought claims for constructive and actual fraudulent conveyance under New York law (N.Y. Debt. & Cred. L. § 273-a and § 276, respectively), as well as for turnover under both New York (CPLR § 5225) and federal law (Terrorism Risk Insurance Act ("TRIA"), 28 U.S.C. § 1610).  *Id.*

Before the Court is Plaintiffs' motion for partial summary judgment on the turnover claims.  Doc. 103.  For the reasons set forth below, the motion is GRANTED.

I.      BACKGROUND

    A.  Factual Background

Familiarity with the facts underlying this action is assumed, and these facts are discussed in more detail in the Court's July 20, 2023 Opinion and Order ("the July 2023 Opinion") granting in part, and denying in part UBAF's motion to dismiss, Doc. 26, as well as the Court's March 31, 2025 opinion denying Plaintiffs' motion to compel UBAF to produce documents and UBAF's motions for a protective order and attorney's fees,

Doc. 90. The below is a summary of the relevant facts contained in the parties' Rule 56.1 statements of material facts, and they are undisputed unless otherwise noted.

### 1. Historical Background

Since 1979, the U.S. Department of State has continuously designated Syria a state sponsor of terrorism for its support of Hamas, al-Qaeda in Iraq, and the Zarqawi Terrorist Organization. Doc. 105 ¶¶ 1–2. Syria has allegedly provided support to terrorist activities, including material support and encouragement to these three terrorist and militant groups.[1] Following several attacks between 2001 and 2006, Plaintiffs brought suit in the United States District Court for the District of Columbia, seeking damages pursuant to 28 U.S.C. § 1605A of the Foreign Sovereign Immunities Act ("FSIA"). *Id.* ¶¶ 4–5. Judgments have been registered for all of these cases in the Southern District of New York. *Id.* ¶ 6.

President George W. Bush issued Executive Order 13338 on May 12, 2004 in response to the Syrian Government's policies of supporting terrorism, occupying Lebanon, pursuing weapons of mass destruction and missile programs, and undermining U.S. and international efforts to stabilize Iraq. Doc. 105 ¶ 7. President Bush and President Obama subsequently signed Executive Order 13382 of July 1, 2005 and Executive Order 13582 of August 17, 2011, respectively, to attempt to curb support to Syria by imposing sanctions blocking "[a]ll property and interests in property that are in the United States" to support Syria. *Id.* ¶¶ 8–9.

The U.S. Department of Treasury (the "Treasury") announced on January 4, 2021 that UBAF, a foreign financial institution organized under the laws of France and headquartered in Paris, had "settle[d] its potential civil liability for 127 apparent

---

[1] Plaintiffs say that "Syria acted as a safe haven for both groups," Doc. 105 ¶ 3, to which Defendant responds that it is unclear what Plaintiffs mean by "both groups," given that Plaintiffs identify three groups in ¶ 2 of their Rule 56.1 Statement. Doc. 123 ¶ 3. The Court assumes that Plaintiffs mention of "both groups" is a mistake, and that they meant to say that Syria acted as a safe haven for all three groups: Hamas, al Qaeda, and the Zarqawi Terrorist Organization.

violations of Syria-related sanctions (the 'Apparent Violations')" of Executive Order 13382 and Executive Order 13582.[2]  Doc. 123 ¶¶ 7, 10 (quoting Myatt Decl., Doc. 109-11 at 1).  Plaintiffs add that the 127 transactions "total[ed] $2,079,339,943.52."[3]  Doc. 106 at 12.

On February 28, 2022, approximately 13 months after the Treasury's announcement of its settlement with UBAF, Plaintiffs filed the instant action against UBAF for fraudulent conveyance and turnover.  Doc. 1 ¶¶ 103–12.

2.  *Syria and UBAF Transactions*

Plaintiffs allege that Syria partnered with UBAF to fraudulently evade seizure of assets that would have been subject to attachment and execution by victims of terrorism lawsuits.  Specifically, Plaintiffs argue that "[t]o evade U.S. sanctions and the likelihood that its assets would be seized, and thus made available to its creditors, Syria worked with UBAF to disguise the flow of its assets through the U.S. financial system" while Plaintiffs' lawsuit was pending.[4]  Doc. 106 at 11–12.

"UBAF holds assets belonging to five different Syrian institutions that are owned directly or indirectly by the Syrian government."  Doc. 105 ¶ 19.  As of July 1, 2025, UBAF held the equivalent of $50,015,746 in depository accounts controlled by the Syrian government.[5]  Doc. 105 ¶ 20.  UBAF clarifies that it does not hold any of this amount in USD, but instead, cumulatively holds approximately 1,332,650,000 Japanese Yen; 4,000

---

[2] UBAF settled with the Treasury for $8.5 million.  Doc. 106 at 12.

[3] UBAF argues that this does not constitute a factual finding by Office of Foreign Assets Control ("OFAC").  Doc. 123 ¶ 13.

[4] UBAF argues that the OFAC statement that "UBAF operated U.S. dollar (USD) accounts on behalf of sanctioned Syrian financial institutions and indirectly conducted USD business on behalf of these institutions through the U.S. financial system" does not constitute a factual finding.  Doc. 123 ¶ 11.  UBAF adds that it made no admissions of fact.  *Id.*

[5] The parties disagree as to the meaning of "control" as used in ¶ 20 of Plaintiffs' Rule 56.1 Statement.  Doc. 105 ¶ 20.  UBAF clarifies that it agrees with the use of "control" to the extent it is being used as a synonym of "direct or indirect ownership."  Doc. 123 ¶ 20.

Canadian Dollars; and 34,552,000 Euros "on behalf of the five Syrian entities identified in the Stipulation." Doc. 123 ¶ 20.

Deloitte & Touche ("Deloitte") performed a transaction review for UBAF for the period beginning on May 2, 2009 and ending on May 2, 2014, finding that "UBAF processed no fewer than ▮ transactions involving Syrian parties sanctioned by the United States, including at least ▮ transactions that involved the 'clearing of [USD] transactions through the U.S.,' totaling '▮▮.'"[6] Doc. 105 ¶ 14.  Plaintiffs further allege that UBAF was aware that USD were being transferred to Syrian entities. Doc. 106 at 13.  Specifically, Plaintiffs argue that at least ▮▮ transited through UBAF's U.S. correspondent bank account, and UBAF kept the money in its accounts abroad following the transactions. *Id.*

UBAF asserts that it did not process "any transaction using its New York correspondent account directly on behalf of any sanctioned Syrian entity[,]" and that most of the transactions Plaintiffs are referring to are "irrelevant to this matter as they had no relationship with any transaction involving UBAF's U.S. correspondent account." Doc. 123 ¶ 14.  UBAF adds that it "used the U.S. correspondent account only to perform three types of transactions:  (1) transfer USD from UBAF's account at the U.S. correspondent bank to a third party (outgoing USD clearing); (2) receive USD in UBAF's correspondent account from a third party (incoming USD clearing); and (3) buy or sell USD for its own account from [] its U.S. correspondent bank [with respect to a few types of transactions]." *Id.* ¶ 15.

---

[6] The transactions included: ▮ trade financing transactions totaling ▮▮ involving a sanctioned party; ▮ back-to-back letters of credit in which UBAF acted as the intermediary for importers and exporters totaling ▮▮; ▮ transfers on behalf of sanctioned parties and outgoing USD clearing totaling ▮▮; ▮ transfers to a sanctioned party and incoming USD clearing totaling ▮▮; ▮ book-to-book transfers with sanctioned parties and incoming USD clearing through an intermediary bank totaling ▮▮; ▮ book-to-book transfers with sanctioned parties and outgoing USD clearing through an intermediary bank totaling ▮▮; ▮ book-to-book foreign exchange transactions with a sanctioned party and USD clearing through another foreign exchange transaction totaling ▮▮; and ▮ book-to-book deposits with sanctioned parties and third-party UBAF deposits with USD clearing totaling ▮▮. Doc. 105 ¶ 14.

4

### B. Procedural Background

The July 2023 Opinion dismissed Plaintiffs' first and second counts asserting claims for constructive and actual fraudulent conveyance and declined to dismiss their third and fourth counts asserting claims for turnover pursuant to CPLR § 5225 and the TRIA, respectively. Doc. 26 at 24. Regarding the turnover claims, the Court found that "personal jurisdiction is proper over UBAF" because "[a]ll of Plaintiffs' claims arise from UBAF's use of [a] New York correspondent account[] to transfer, in a manner meant to evade Syrian sanctions, funds allegedly used to support terrorist attacks that injured Plaintiffs," which is "sufficient." *Id.* at 18. And because it "has personal jurisdiction over UBAF," the Court held that "it therefore has jurisdiction to order [UBAF] to recall extraterritorial assets owned by Syria to New York, which in turn means the Court has jurisdiction over Plaintiffs' turnover claims." *Id*. at 24.

On July 24, 2023, UBAF moved for reconsideration of the July 2023 Opinion, or in the alternative, for the Court to stay the case pending the Second Circuit's decision in *Levin v. Bank of New York*, No. 22-624, Doc. 27. The Court granted the stay on August 10, 2023, and on September 1, 2023, after the Second Circuit dismissed the appeal in *Levin*, the Court ordered the parties to proceed to discovery. Doc. 43 at 4–5.

On September 7, 2023, UBAF filed a letter seeking clarification of the Court's July 2023 Opinion. Doc. 44 at 2. Specifically, whether it "effectively attached any Syrian property that UBAF holds abroad, and whether it requires UBAF to restrain such property[.]" *Id*. In the letter, UBAF informed the Court that it had "received a demand from a French bailiff, [obligating it] to turn over certain funds held for a Syrian financial institution by September 15[, 2023]." *Id.* at 1. In response, Plaintiffs moved for, among other things, leave to file a restraint notice pursuant to CPLR § 5222 concerning the assets being held by UBAF; the Court granted Plaintiffs leave to file at a conference held on September 14, 2023. Docs. 46, 48–51.

On October 25, 2023 ("October 2023 Order"), the Court declined to issue the restraint notice, at the time, citing, *inter alia*, "the absence of evidence that the assets Plaintiffs ask the Court to restrain are assets of their 'judgment debtor.'" Doc. 60 at 6. Specifically, the Court held that "[b]ased on the current record before" it, "it is [equally] likely that "the 'Syrian financial institution' is a private corporation with no affiliation to the Syrian government" or "a state-owned bank," only the latter of which would be Plaintiffs' judgment debtor. *Id.* at 5. Additionally, regarding the alleged $2 billion in blocked assets, the Court held that "based on the record … at this time, [it] cannot conclude that [the alleged assets] … ever entered the United States," as required for Plaintiffs to be able to reach those assets under the TRIA. *Id.* at 5–6.

In December 2023, UBAF made an initial production ("December 2023 Production") to Plaintiffs, that included "a spreadsheet … that identified 11 accounts held by UBAF for 7 different pseudonymized accountholders," and included a column identifying: (a) each account as Governmental, Nongovernmental, or Unknown; (b) the currency of the funds held in each account; and (c) the approximate account balances rounded to the nearest 1,000 of the currency held in each account. Doc. 80 ¶ 11. "UBAF subsequently produced a revised version of this chart adding assets held for another entity that Plaintiffs identified in their motion for a temporary restraining order as a 'Syrian Sanctioned Entity,' but was not identified as a Syrian national in UBAF's records." *Id.*

On February 29, 2024, UBAF made a second production of 343 documents, "consisting primarily" of the documents that UBAF had previously produced to OFAC regarding the transactions underlying UBAF's settlement with OFAC, as well as chains of anonymized SWIFT messages and transfers. *Id.* ¶ 17. These included "the same redacted and pseudonymized transaction records that OFAC had received, and included a chart prepared by OFAC allowing Plaintiffs to match the base penalty amount in OFAC's Enforcement Release to the 127 transaction records included in UBAF's production." *Id.*

6

Plaintiffs note that the "anonymized [SWIFT] messages omitted information about the identities of transferors and transferees, or of relevant accountholders." Doc. 106 at 15.

At the pre-motion conference held on June 14, 2024, the Court granted Plaintiffs leave to file the motion to compel responses to three sets of document requests (the "Requests"). Specifically, they sought: (1) documents providing information relating to bank accounts and payments to or from accounts belonging to Syria or the Syrian Sanctioned Entities, (2) documents relating to the investigation and subsequent settlement of the U.S. Treasury agency, the OFAC with UBAF, and (3) documents regarding contracts, agreements, or transactions among and between UBAF and Syria or the Syrian Sanctioned Entities. *See* Doc. 74. According to Plaintiffs, these documents were key to "produce the information necessary to prove the elements" of their turnover claims, "as laid out by this Court," in the October 2023 Order, Doc. 74 at 11.

On June 19, 2024, Plaintiffs sent UBAF a letter offering to modify document requests 14–18, to exclude documents regarding UBAF's compliance program that had previously been produced to OFAC. Doc. 75-2. In response, on June 25, 2024, UBAF stated, among other things, that it "has reviewed the OFAC production and produced all documents regarding the transactions," and "[f]or the avoidance of doubt, neither unredacted transaction records nor a redaction key were produced to OFAC in connection with this matter." Doc. 75-3.

On June 28, 2024, Plaintiffs filed a motion to compel, Doc. 73, to which UBAF responded on July 12, 2024, with a memorandum titled, Reply Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Discovery and *In Support of Cross-motion for Protective Order*. Doc. 79 (emphasis added). On July 19, 2024, Plaintiffs filed their reply memorandum of law, Doc. 82, on July 22, 2024, UBAF filed a memorandum titled, Reply Memorandum of Law in Support of Cross-motion for Protective Order, Doc. 84. On July 31, 2024, Plaintiffs filed a letter requesting, *inter alia*, that the Court strike UBAF's July 22, 2024 reply as an improper "sur-reply." Doc. 85. UBAF responded on August 8,

2024, Doc. 87.[7]  On  November 21, 2024 and November 27, 2024, Plaintiffs and UBAF,

respectively, filed letters with the Court providing supplemental authority. Docs. 88, 89.

The Court denied Plaintiffs' motion compel, as well as UBAF's motions for a protective

order and for attorneys' fees on March 31, 2025.  Doc. 90.

Plaintiffs filed the instant motion on July 1, 2025, seeking summary judgment on

whether the Syrian funds held in bank accounts at UBAF's Paris location are subject to

turnover as a matter of law.  Doc. 106 at 17.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact."  Fed.R.Civ.P. 56(a).  "An issue of fact is

'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-

moving party."  *Senno v. Elmsford Union Free School District*, 812 F.Supp.2d 454, 467

(S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.

2009)).  A fact is "material" if it might affect the outcome of the litigation under the

governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the

absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  If the burden of proof at trial would fall on the movant, that party's "own

submissions in support of the motion must entitle it to judgment as a matter of law."

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).

Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of

---

[7] UBAF's reply memorandum of law in support of a cross-motion for a protective order contains both arguments in response to Plaintiffs' reply memorandum in support of the motion to compel *and* in support of their cross-motion for a protective order and for attorneys' fees. Doc. 84.  Plaintiffs correctly assert that UBAF's arguments therein responding to Plaintiffs' motion to compel constitutes an improper sur-reply, as UBAF did not request leave to file it.  Therefore, the Court will not consider those arguments.  However, UBAF's reply arguments in support of its motion for a protective order are procedurally proper and may be considered.  Thus, the Court declines to strike the entirety of UBAF's reply, Doc. 84.

fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322–23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

## III.    DISCUSSION

### 1.  Jurisdiction to Order Turnover

New York's Civil Practice Law and Rules ("CPLR") § 302(a)(1) provides that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent [ ] transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR § 302(a)(1).  "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 422 (S.D.N.Y. 2009) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007).  In other words, "[t]he articulable nexus and substantial relationship tests under CPLR [§]

9

302(a)(1) require only that defendant's transaction(s) and plaintiffs' cause of action are related." *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 329 (2012) ("*Licci III*") (internal quotation marks omitted).  CPLR § 302(a)(1) is a "single act" statute, meaning "a single transaction of sufficient quality may invoke jurisdiction, provided that the transaction was purposeful, and the necessary relationship between the transaction and the claim asserted exists." *Rich v. Fox News Network, LLC*, No. 18-cv-2223 (GBD), 2020 WL 6276026, at *3 (S.D.N.Y. Sept. 15, 2020).

Courts have recognized that, while "the requisite inquiry under [CPLR § 302(a)(1)'s] first prong may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States … a foreign bank's repeated use of a correspondent account in New York on behalf of a client … show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci III*, 20 N.Y.3d at 338–39.

Furthermore, as Plaintiffs assert, Courts have determined that a foreign bank's "rout[ing] … dollar transactions on behalf of [a foreign state] … indicates desirability and a lack of coincidence," and, accordingly, "repeated use of the correspondent account shows not only transaction of business, but an articulable nexus or substantial relationship between the transaction [and Plaintiffs' claims]." *Licci III*, 20 N.Y.3d at 340.

The Second Circuit held that "the arising from prong of CPLR [§] 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury.  Instead, it requires a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci IV*") (internal quotation marks and citations omitted).

10

"Ultimately, the question is whether the claim is 'in some way arguably connected to the transaction.'" *Peterson v. Bank Markazi*, 121 F.4th 983, 1004 (2d Cir. 2024), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 340 (2012) ("*Licci II*")).

This Court has already determined that it has personal jurisdiction over UBAF for purpose of the turnover claims. *See* Doc. 26 at 17. As Plaintiffs argue, "UBAF purposefully availed itself of New York's stream of commerce by engaging in 127 transactions with its New York correspondent account for the benefit of account holders subject to U.S. sanction such as the Syrian Entities." Doc. 106 at 19. UBAF "repeated[ly] use[d] a correspondent account in New York on behalf of a client—in effect, 'a course of dealing,'" which indicates purposeful availment. *Licci IV*, 732 F.3d at 170; *see also* Doc. 105 ¶¶ 15–18.

UBAF argues that it is not subject to the jurisdiction of this Court because it is a French bank with no contacts to the United States beyond a correspondent account used for U.S. dollar transfers and because "any assets it may hold for Syria are held abroad and, as they are not denominated in U.S. dollars, could not have been transferred through the account." Doc. 122 at 25. Accordingly, UBAF concludes that Plaintiffs failed to show that either element of the turnover claim pursuant to CPLR § 5225(b) is met—(1) the garnishee is "in possession or custody of money or other personal property in which the judgment debtor has an interest," and (2) "the judgment debtor is entitled to the possession of such property." CPLR § 5225(b). UBAF also argues that "Plaintiffs' claims do not 'arise from' UBAF's minimal contact with New York," Doc. 122 at 26, since "UBAF only used its New York correspondent account for three types of U.S. dollar transfers, none of which could possibly relate to UBAF's current holdings on behalf of the Syrian Accountholders." Doc. 122 at 28. UBAF adds that "Plaintiffs [do not] allege any basis to link non-USD balances held today to transactions conducted [using] UBAF's USD correspondent account more than ten years ago." Doc. 122 at 28.

11

In short, UBAF asserts that there is no connection between its use of a New York correspondent account and Plaintiffs' turnover claims. Doc. 122 at 29.

However, Plaintiffs correctly assert that "UBAF refused to provide the discovery necessary to test that assertion, including evidence that would allow Plaintiffs and this Court to review the connection between the use of the correspondent accounts and the Syrian funds still at UBAF." Doc. 129 at 12. Instead, UBAF insisted that a stipulation as to the relevant information was sufficient. Doc. 129 at 13 (citing Doc. 90 at 13).

And, in any case, the Court of Appeals has clarified that the requirements of New York's long-arm statute's are met as long as "defendant's New York business activity and [plaintiffs'] injury" are "not completely unmoored" from one another. *Licci IV*, 732 F.3d at 168–69. "Ultimately, the question is whether the claim is 'in some way arguably connected to the transaction.'" *Peterson IV*, 121 F.4th at 1004. Here, Plaintiffs allege that "UBAF repeatedly transacted business in New York," Doc. 129 at 12, including committing 127 violations of Syria-related sanctions. Doc. 123 ¶¶ 7, 10 (quoting Myatt Decl., Doc. 109-11 at 1). Plaintiffs allege that these transactions were carried out "for the benefit of account holders subject to U.S. sanction such as the Syrian Entities." Doc. 106 at 19. Therefore, "[n]either element of [CPLR §] 5225(b) can … be extricated from the 'frequen[t] and deliberate nature of [UBAF]'s use of its correspondent accoun'" Doc. 106 at 19 (citing *Peterson IV*, 121 F.4th at 1005). Accordingly, "Plaintiffs' cause of action for turnover . . . arises from [UBAF's] New York business transactions such that the exercise of personal jurisdiction over [UBAF] with respect to the turnover claim complies with the New York longarm statute." *Peterson IV*, 121 F.4th at 1005.

　　　　*a.   Exercising Personal Jurisdiction Over UBAF Does Not Violate Due Process*

Even in cases where the Court determines that Defendant has sufficient contacts with the forum state to exercise personal jurisdiction, the Court "must also determine whether the exercise of personal jurisdiction is reasonable under the Due Process Clause." *Peterson IV*, 121 F.4th at 1006. Plaintiffs argue that "exercising personal

jurisdiction over UBAF comports with due process, since UBAF (1) 'has minimum contacts with the forum,' and (2) 'the exercise of personal jurisdiction is reasonable in that it comports with 'traditional notions of fair play and substantial justice.'"  Doc. 106 at 20 (quoting Doc. 26 at 19, Court's Opinion and Order on UBAF's motion to dismiss).

The Court already established that UBAF has minimum contacts with New York, so the due process analysis will focus on the reasonableness of asserting jurisdiction over UBAF.  *Licci IV*, 732 F.3d at 173 (correspondent account satisfies minimum contacts if used "as an instrument to achieve the wrong complained of").

In assessing the reasonableness of asserting jurisdiction, courts consider:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

UBAF argues that exercising personal jurisdiction would "impose[] unreasonable burdens" on it because "[i]f turnover is ordered and UBAF disburses the Syrian Accountholders' funds to Plaintiffs, those entities will likely initiate litigation in France to recover those funds, subjecting UBAF to double liability."  Doc. 122 at 30.  Specifically, UBAF argues that "[u]nder French law, a bank can only debit a client account without client permission on the basis of a foreign judgment if that judgment is recognized and granted enforceability in France ('exequatur')."  Doc. 122 at 30 (citing Declaration of Valérie Mayer ("Mayer Declaration"), Doc. 125 ¶¶ 8–14).  UBAF alleges that a turnover order would likely not satisfy the criteria for exequatur, so Syria would be able to assert immunity in France because there, "sponsorship of, without direct participation in, acts of terrorism is insufficient to waive immunity."  Doc. 122 at 30.  Accordingly, UBAF continues, "UBAF would be found to have wrongfully disposed of client assets by

complying with a turnover order and would be subject to liability for the amount transferred without client consent." *Id.* at 31.

However, as Plaintiffs argue, "the hypothetical possibility that UBAF may somehow be liable in France does not deprive this Court of jurisdiction." Doc. 129 at 13. And, in any case, "the risk of double liability arising from such a dispute is "assumed *as part of the business of a bank*" in part because "that risk is a foreseeable one that banks presumably consider in setting the fees charged to account holders." *JPMorgan Chase Bank, N.A. v. Motorola, Inc.*, 47 A.D.3d 293, 311 (1st Dep't. 2007). Given that UBAF "has purposefully availed itself of the laws of New York, it would be unfair to allow it to evade jurisdiction in the state simply because it could be subject to double liability, a risk that is assumed under well-established principles of New York law." *Peterson IV*, 121 F.4th at 1007.

UBAF further argues that France's interest in hearing Plaintiffs' claims "undermine[s] U.S. jurisdiction." Doc. 122 at 31–32. Additionally, citing *Daimler AG v. Bauman*, UBAF argues that Courts must consider "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction," 571 U.S. 117, 139 n.20 (2014) (emphasis in original), including UBAF's procedural right to assert its immunity in execution proceedings and a substantive rejection of sovereign liability for conduct that falls short of being terrorism. Doc. 122 at 31–32. Although Plaintiffs do not directly address these arguments, Plaintiffs' assertion that "the *hypothetical* possibility that UBAF may somehow be liable in France does not deprive this Court of jurisdiction" once again weighs in favor of finding that this Court has jurisdiction to order turnover. Doc. 129 at 13 (emphasis added).

    *2. Plaintiffs Are Entitled to Turnover Pursuant to CPLR § 5225*

Article 52 of the CPLR governs the enforcement and collection of money judgments in New York. *See* CPLR §§ 5201–53. CPLR § 5225(b) provides, in relevant part:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

CPLR § 5225, "allows a court to order turnover of a judgment debtor's property by exercising jurisdiction only over a garnishee custodian of the property." *Peterson IV*, 121 F.4th at 996 (citing *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009)). The Second Circuit has held that "New York law—specifically CPLR [§] 5225(b)—is one exception to the general principle that courts cannot reach extraterritorial property." *Peterson IV*, 121 F.4th at 1006; *Koehler*, 12 N.Y.3d at 539 (noting that legislators "intended [for CPLR] to have extraterritorial reach.").

Specifically, under CPLR § 5225(b), New York courts can "issue a judgment ordering a party to deliver the property in which the judgment debtor has an interest, or to convert it to money for payment of the debt." *Koehler*, 12 N.Y.3d at 537. Other courts in this district have held that "the FSIA … does not supersede CPLR [§] 5225" nor does it prevent courts from directing a garnishee "over which it has personal jurisdiction[]" to compel turnover of foreign-sited assets "into New York to pay [judgment creditor]." *Bainbridge Fund Ltd. v. Republic of Argentina*, 690 F. Supp. 3d 411, 416 (S.D.N.Y. 2023).

Therefore, under CPLR § 5225(b), Plaintiffs only need to establish that (1) "the judgment debtor has an interest in the property that the creditor is trying to reach," and (2) Plaintiffs' interest in the property is superior to any interest of UBAF in the property. *Hyegate, LLC v. Boghossian*, No. 21-cv-1450 (JGK), 2022 WL 1488171, at *2 (S.D.N.Y.

15

May 11, 2022) (quoting *Commodities & Minerals Enterprise Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019)).

Here, Plaintiffs have satisfied both requirements. *First*, UBAF maintains the equivalent of $50,015,746 in depository accounts for Syrian entities. Doc. 105 ¶¶ 19–20. Additionally, UBAF disclosed all the amounts that it "holds in accounts under the name of entities that are owned directly or indirectly by the Syrian government … ███████ ████████████████████████████████████████████████████████." Doc. 101 ¶ 2 (emphasis added). Plaintiffs argue that this unidentified amount of assets are funds that are "████████████████████████████████████" Doc. 106 at 24. *Second*, no other party has a superior interest than Plaintiffs have in the assets. Doc. 101 ¶ 3 ("UBAF will not assert that it has a proprietary interest in the deposit claims identified…"). Accordingly, "[b]ecause UBAF is subject to this Court's jurisdiction, holds assets of Syria … and does not assert a property interest in the Syrian Entities' funds, Plaintiffs are entitled to turnover of the Syrian Entities' assets held at UBAF." Doc. 106 at 21.

### a. The Separate Entity Rule Does Not Apply

The separate entity rule does not bar turnover. "The separate entity rule … provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to … article 52 postjudgment restraining notices and turnover orders." *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 158 (2014).

UBAF argues that the separate entity doctrine also prevents a CPLR turnover order from reaching the assets UBAF holds in its overseas branches. Doc. 122 at 23. However, as Plaintiffs argue, "the [separate entity] doctrine just stops a court from reaching one branch of a larger bank on the grounds that it can reach a different branch in its jurisdiction." Doc. 129 at 14; *see also Next Investments, LLC. v. Bank of China*, 12 F.4th 119, 133 (2d Cir. 2021) ("[T]he separate entity rule should be 'understood as akin to

16

a rule governing service of process' independent of jurisdiction," and stating that the Court did would not decide whether the separate entity rule applied).

Plaintiffs assert they "seek turnover of these assets held at UBAF's Paris branch, which is the same Paris branch that Plaintiffs' caused to be served via the Hague Convention in order to initiate this case." Doc. 129 at 14. Accordingly, given that only one UBAF branch is relevant here, the separate entity rule does not apply.[8]

### 3. Immunity

Lastly, the Syrian assets are not immune under the FSIA. Section 1609 of the FSIA provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609. Under 28 U.S.C. § 1610(g):

> [T]he property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section…

Plaintiffs argue that, "[a]s victims of state-sponsored terrorist acts," they may "execute against the assets of Syria and its agencies and instrumentalities, neither of which are immune under the FSIA." Doc. 106 at 20–21. UBAF stipulated that it holds assets "in accounts under the name of entities that are owned directly or indirectly by the Syrian government." Doc. 101 ¶ 2. Accordingly, the Court finds that, as Plaintiffs argue, these assets are subject to attachment under 28 U.S.C. § 1610(g). Doc. 106 at 21, 26.

---

[8] The Court had already determined that "[i]f the Court were to direct UBAF to recall the assets to the United States pursuant to *Peterson II* and, upon conducting a traditional Foreign Sovereign Immunities Act analysis, find that those assets were not immune and were subject to execution, as it held in the Opinion, the separate entity rule would likely not be a bar to execution *at that time*, even though the separate entity rule *currently* operates to prevent a restraint on those assets while held abroad." if the assets held by UBAF were ordered to be brought to the United States. Doc. 60 at n.1 (emphasis in original).

UBAF asserts that "Plaintiffs are not entitled to summary judgment on their turnover claims because … the Syrian Assets are absolutely immune as sovereign property held overseas" in France.  Doc. 122 at 14, 15.  UBAF's primary argument is that the FSIA did not alter the "long-standing principle" that a foreign sovereign's assets located outside the United States are immune from courts ordering execution of those assets to satisfy judgments.  Doc. 122 at 15 (quotation marks omitted).  Specifically, UBAF argues that § 1610(g) "does not provide a freestanding basis to attach and execute against the property of a foreign state."  Doc. 122 at 22 (quoting *Levin v. Bank of N.Y.*, No. 09-cv-5900 (JPO), 2022 WL 523901, at *2 (S.D.N.Y. Feb. 22, 2022).

UBAF adds that, until *Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017) ("*Peterson II*"), every court recognized "that the FSIA lacks extraterritorial reach for execution purposes."[9]  Doc. 122 at 16.  Specifically, UBAF relies on *Stephens v. National Distillers & Chemical Corp.* to argue that foreign sovereigns have absolute immunity from attachment.  69 F.3d 1226 (2d Cir. 1995), *amended* (Jan. 11, 1996); *see also* Doc. 122 at 15, 18.  UBAF further argues that the Supreme Court remanded *Peterson II* and it therefore has no precedential force.  Doc. 122 at 18.  According to UBAF, the Supreme Court repudiated *Peterson II*, therefore restoring the status of *Stephens* as binding precedent.  Doc. 122 at 19.

However, as this Court previously held, "the Supreme Court did not repudiate *Peterson II*'s holding" that this Court has jurisdiction over UBAF "to order it to recall extraterritorial assets owned by Syria to New York."  Doc. 26 at 24.  Additionally, "[t]he FSIA … does not supersede CPLR [§] 5225 and prevent the Court from ordering … a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay [Plaintiffs]."  *Petersen Energia Inversora, S.A.U. v.*

_____

[9] In arguing this, UBAF cites to a several Second Circuit cases, as well as cases from other circuit courts. Doc. 122 at 16–18.  However, all but one of the cases UBAF cites pre-date *Peterson II* and go as far back as 1992.

*Argentine Republic*, No. 15-cv-02739 (LAP), 2025 WL 1796392, at *6 (S.D.N.Y. June 30, 2025).  Accordingly, the Syrian assets are not immune under the FSIA.

UBAF argues that TRIA § 201(a) likewise does not waive immunity of a sovereign's assets that are held overseas.  Doc. 122 at 22.  UBAF cites to the Court's Order Denying Restraint:  "TRIA § 201(a) only applies to blocked assets, and the Syrian sanctions regime only blocks property and interests in property that are in the United States or in the possession or control of *any U.S. person* … The assets at issue here are in Paris and are held by a French bank and therefore satisfy neither definition of a blocked asset, meaning that TRIA cannot reach those assets."  Doc. 60 at 5 (emphasis in original). However, the Second Circuit has held that "regardless of whether it has been frozen or seized—any property belonging to the [the government of a foreign sovereign] (as well as its agencies or instrumentalities) under the relevant executive orders is 'blocked' within the meaning of TRIA."  *Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 98 n.6 (2d Cir. 2022).  Here, the assets belong to Syria and are therefore considered blocked.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion is GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Docs. 103, 114.  The parties are directed to appear for a conference on April 14, 2026, at 11:00 a.m., in Courtroom 619 at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007.

It is SO ORDERED.

Dated:    March 23, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

19